Chicago, Wilmington & Vermillion Coal Co. v. The People.

---

The Chicago, Wilmington & Vermillion Coal Company, et al., v. The People of the State of Illinois.

### Gen. No. 11,267.

1. COMBINATION IN RESTRAINT OF TRADE—*when, criminal.* A systematic attempt, covering a period of years, by an association made up of large producers of coal, to control the output, sale and price of a certain kind of coal within certain territory of Illinois, is a criminal combination in restraint of trade, both at common law and under the statutes of Illinois.

2. COMBINATION IN RESTRAINT OF TRADE—*what deemed common law offense.* A combination by an association of persons which has a tendency to diminish production, to limit competition, and to increase prices, was and is a common law offense and punishable in this state, notwithstanding the prices fixed by such association may have been fair and reasonable, and notwithstanding, further, such association may not, in fact, have advanced the price of the product involved in such illegal combination.

3. PROPOSITIONS OF LAW—*failure to mark.* A failure to mark propositions of law, either given or refused, is equivalent to a refusal thereof.

4. JUDICIAL NOTICE—*of what, not taken.* Judicial notice will not be taken of a report of the grand jury which is voluntary upon its part and not made pursuant to any law providing therefor.

5. INDICTMENT—*what will not be considered in determining validity of.* The report made by a grand jury as its voluntary act will not be considered in determining whether an indictment returned by it is valid or invalid.

6. INDICTMENT—*when, sufficient to sustain conviction.* If one count of an indictment is good, a general finding that the defendants are guilty will not be disturbed because the indictment contains other counts which are bad.

76     APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

7. CONSPIRACY—*when offense of, complete.* Conspiracy as a criminal offense is complete when the agreement to do the unlawful act in question is entered into.

8. CONSPIRACY—*what indictment for, need not set forth.* An indictment for conspiracy need not set out the means by which the conspirators intended to accomplish their unlawful purposes.

9. CONSPIRACY—*when indictment for, is sufficient.* An indictment charging the statutory offense of conspiracy is sufficient if in the language of the statute pertaining thereto.

10. CONSPIRACY—*when indictment for, sufficiently charges intent.* If a conspiracy to do an illegal act be set forth in an indictment, the charge is complete without the addition of words alleging the criminal intent in the doing of the act; in stating such an offense the criminal intent appears *prima facie* in the statement of the act itself.

11. CONSPIRACY—*when indictment for, sufficiently charges intent.* Where an indictment alleges that a conspiracy was entered into "unlawfully, fraudulently, maliciously and wickedly," it is sufficient, even in those cases where the object for which the combination was formed was not unlawful until forbidden by statute.

12. CONSPIRACY—*how existence of, established.* The evidence of combination, ordinarily, must be gleaned from conduct; the test is not what an agreement may profess but what it actually accomplishes. Proof of an agreement actually entered into is not essential; the mere tacit understanding between conspirators to work to a common purpose is all that is essential to an actionable combination.

13. CONSPIRACY—*common law with respect to, not abolished in this state.* The common law concerning conspiracies is not abolished by statute in Illinois.

14. CONSPIRATORS—*joint responsibility of.* Each member of an unlawful association and conspiracy is bound by the acts of all its or his fellows done in furtherance of the object to accomplish which the combination is formed.

15. ANTI-TRUST ACT—*provision of, unconstitutional.* The provision, added by amendment to the Anti-Trust Act, which exempts combinations, where their principal object or effect is to maintain or increase wages, is unconstitutional and void.

16. ANTI-TRUST ACT—*what need not be alleged or proved to establish violation of.* In a prosecution for a violation of such act, it is not necessary to allege and prove the place of organization of the corporation defendant.

17. ANTI-TRUST ACT—*how corporation violating, should be prosecuted.* A prosecution against a corporation violating this act is properly by indictment, although it may, at the election of the people, be by action of debt to recover the penalty prescribed by such statute.

18. UNCONSTITUTIONAL LAW—*no defense to criminal charge.* An unconstitutional act, in legal contemplation, is not a law and affords no protection to a criminal charge.

Chicago, Wilmington & Vermillion Coal Co. v. The People.

19. COMMON LAW—*how far, in force in this state.* By statute the common law of England, so far as applicable, is adopted in this state, and such adoption includes all the statutes or acts' of the British Parliament made in aid and to supply the defects of the common law, prior to the fourth year of James 1, (except three chapters specifically mentioned) which are of a general nature and not local to that kingdom.

20. COMMON LAW—*when, not superseded by statute.* When the common law and a statute differ, the common law gives place to the statute only where the latter is couched in negative terms or where it is made so clearly repugnant that it necessarily implies a negative.

21. REPEALS BY IMPLICATION—*rules with respect to.* When there is a clear repugnancy between two laws and the provisions of both cannot be carried into effect, the latter law must prevail as the last expression of the legislative body; also, if the subsequent statute revises the whole subject-matter of a former one and is intended as a substitute for it, it operates as a repeal of the former, although it contains no express words to that effect; but repeals by implication are not favored.

22. STATUTORY CRIME—*effect of creation of, upon analogous common law offense.* The adoption of a statute with reference to a crime does not abolish the doctrines and practice of the common law in relation thereto so far as that crime is not covered by the act. Where the statute has not in express words defined the crime and fixed the punishment, the common law remains in full force and vigor, and if it be abated by statute, when that statute is repealed it springs up anew.

23. CRIMINAL CODE—*section 46 of, relating to the offense of conspiracy, not repealed.* This section of the Criminal Code was not repealed by the enactment of the Anti-Trust Act of 1891.

24. "MAY"—*how construed.* It is true that "may" oftentimes means "must" but it always retains its primitive meaning unless common fairness and the rights of the parties litigant demand that it be supplanted by "must," or unless it is used in a sentence which creates an exception in favor of the public.

25. TRUST—*definition of.* A pool or trust is a combination having the intention and power or tendency to monopolize business or to control production or to interfere with trade or to fix and regulate prices, and the like, and under the statutes of this state the application of the rule does not depend upon the number of those who may be implicated, nor the extent of territory covered by the combination, but does depend upon the existence or non-existence of a tendency to injure the public.

Criminal prosecution for conspiracy in violation of Anti-Trust Act. Error to the Criminal Court of Cook County; the Hon. OLIVER H. HORTON, Judge, presiding. Heard in this court at the October term, 1903. Affirmed. Opinion filed May 12, 1904.

**Statement by the Court.** The plaintiffs in error (who hereinafter will be designated as defendants) were indicted

78     APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

at the January term, 1903, of the Criminal Court of Cook county.

The first count alleged that on January 5, 1903, in said county of Cook the defendants "unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to wit: To then and there in restraint of trade and to the injury of the public trade unlawfully create, enter into and become members of and parties to a pool, trust, agreement, combination, confederation and understanding with each other wrongfully to regulate and fix the price at which coal should be sold in the said State of Illinois, which said coal was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, to the great damage and injury of all purchasers of said coal and contrary to the statute, and against the peace and dignity of the same people of the State of Illinois."

The second count charged that they "then and there unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to wit: To then and there in restraint of trade and to the injury of the public trade, unlawfully create, enter into and become members of and parties to a pool, trust, agreement, combination, confederation and understanding with each other wrongfully to regulate and fix the price at which coal should be sold in the said State of Illinois, which said coal was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, to the great damage and injury of all purchasers of said coal, contrary to the law and against the peace and dignity of the same people of the State of Illinois."

The third count set forth that they "then and there unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to wit: To then and there in restraint of trade and to the injury of the public trade,

unlawfully regulate and fix the price at which coal should be sold in the said State of Illinois, which said coal was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, said coal being then and there a commodity and article of merchandise, contrary to the statute and against the peace and dignity of the same people of the State of Illinois."

It is stated in the fourth count that they "then and there unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to wit:   To then and there in restraint of trade and to the injury of the public trade, unlawfully regulate and fix the price at which coal should be sold in the said State of Illinois, which said coal was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, said coal being then and there a commodity and article of merchandise, contrary to the law and against the peace and dignity of the same people of the State of Illinois."

The fifth count declared that they, each being then and there engaged in or interested in the business of selling coal to the general public and to consumers of said coal, did then and there wickedly and unlawfully create, enter into and become members of and parties to a pool, trust, agreement, combination, confederation and understanding with each other, then and there to unlawfully regulate and fix the price at which coal should be sold in the State of Illinois, which said coal was to be thereafter mined, produced and sold in the State of Illinois, and was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, said coal being then and there a commodity and article of merchandise, whereby and by force of the statute in such case made and provided, the said defendants, and each of them, are deemed and adjudged to be guilty of a conspiracy to defraud, contrary to the statute and against the peace and dignity of the same people of the State of Illinois.

The first count is drawn under section 46 of the Criminal

80 · APPELLATE COURTS OF· ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

Code. The second is based upon the common law concerning combinations to regulate and fix the price of a necessary·of life. The third alleges a conspiracy to do an illegal act injurious to public trade, and concludes "contrary to the statute." The fourth is at common law charging a combination to regulate the price of coal, an article of necessity, etc. The fifth alleges the formation of a pool to unlawfully regulate and fix the price at which coal should be sold in the State of Illinois, and is based upon the Anti-Trust Law of 1891.

In each of these counts it is the conspiracy, and not the ·object sought to be accomplished by it, that is the subject of indictment. In all these counts each defendant is designated by its proper name. The only words of description following the several names are "a corporation."

A motion in writing to quash the indictment was filed for each defendant These motions are identical except as to the name of the defendant in whose behalf it is filed. This motion was overruled; to which action each of the defendants then and there excepted.

A jury having been duly waived, and the cause having been by agreement of all parties submitted for trial by the court, the People, to sustain the issue upon their part, offered in evidence the following statement of facts :

"For the purposes of submitting the issues of fact and law in the above entitled case to the court for trial and decision upon the indictment herein (it being hereby expressly understood that the admissions and agreements herein made are made for such purposes only, and shall not be binding upon the defendants herein in any other proceeding at law or in chancery or of whatsoever nature), the following statement of facts is hereby agreed to by and between the respective parties hereto, and each of them, and it is further agreed that the said statement shall be received as evidence of such facts upon the trial of the above entitled cause, to wit :

(1) That the Northern Illinois Soft Coal Association is a voluntary association, which was formed and organized

about fifteen or twenty years ago, then composed of various corporations and individuals engaged in the business of operating in and mining soft coal in the northern part of the State of Illinois.

(2)   That said association has been in existence from the date of the formation thereof to the present time, and assumed the name and style aforesaid in the year 1897.

(3)   That at the first meeting thereof, one A. L. Sweet, then an officer of The Chicago, Wilmington & Vermillion Coal Company, one of the defendants herein, was chosen and acted as president of said meeting, and one Edward T. Bent, an authorized representative of the Oglesby Coal Company, one of the defendants herein, was chosen and acted as secretary of said meeting; that at said meeting there were various authorized representatives of different coal companies then operating in and mining soft coal in the northern part of said State of Illinois, including some of the defendant companies herein, and that various meetings of said association have been held since the formation thereof up to and including December 13, 1902, at most of which said A. L. Sweet has acted as the president and presiding officer thereof, and said Bent as the secretary thereof, each of whom was duly authorized to act at said association meetings for said Chicago, Wilmington & Vermillion Coal Company and said Oglesby Coal Company, respectively.

(4)   That said association has never adopted any constitution, by-laws or provisions for penalties or terms of admission to or expulsion from said association; that the several defendant companies, through their authorized representatives, have from time to time held meetings, which were called by said Bent as secretary of said association, and that all of said meetings have, since some time in the year of 1897, been held in Chicago, in the County of Cook and State of Illinois, and that assessments for routine expenses were levied and paid upon and by said companies, the last being levied and paid September 20, 1902.

(5)   That at said meetings discussions were had and

82     APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

resolutions passed respecting the subject of wages, transportation and prices at which the several defendant companies and others there represented, as aforesaid, should sell the coal so mined by them on the market to consumers thereof in the State of Illinois and elsewhere; that between July 1, 1891, and July 1, 1897, no action was taken by said association at its said meetings with respect to prices of said coal.

(6) That during the existence of said association the said Edward T. Bent has acted as the secretary of said association, and as such has called said meetings by sending notices thereof to the defendant companies and other coal mining companies so operating in and mining coal in Northern Illinois, and that after each meeting, with a few exceptions, he has transmitted to each of the defendant companies, and said other coal mining companies, copies of the proceedings had at said meeting.

(7) That at a meeting of said association held in Chicago, aforesaid, March 26, 1900, the following resolution was adopted and a copy thereof transmitted to the defendant companies, and said other coal mining companies represented in said association, as aforesaid, to wit:

'NORTHERN ILLINOIS SOFT COAL ASSOCIATION.

CHICAGO, ILL., March 26, 1900.

DEAR SIR: At a meeting of this association held this day, the following were unanimously adopted:

Resolved, That the price on mine run coal be ten (10) cents per ton less than on standard lump; that when coal is sold through jobbers, the shipping company shall see that full circular prices are maintained by said jobbers; that the maximum commission to jobbers shall be ten (10) cents per ton; that no factory or steam coal shall be sold through jobbers or local dealers at less than established prices thereupon, except to parties or at points fully approved and listed; that no firms shall be recognized as linemen, except as duly approved and listed; that no coal shall be sold to listed linemen, except direct and without commission to any jobber; that no coal shall be sold to linemen at a fixed

price for any specified time; and that listed linemen may be sold from time to time at ten (10) cents per ton less than existing circular prices.

Resolved, That until further action of the association, the circular price to dealers be $2.15 for standard lump and $2.25 for chunks at mines.

A committee, consisting of Messrs. Booth, Lemmon and Bent, was appointed to prepare a list of points at which selling factory or steam coal through local dealers is permissible, and the dealers entitled to a commission thereupon; and an official list of linemen entitled to a ten (10) cents per ton commission from circular prices. Please send at once to one of the members of the committee a list of the points (such as Rockford and Freeport) where you consider it necessary to sell steam and factory coal through dealers, and what dealers at such points you understand should properly participate in this business, and also a list of linemen ("elevator" and "lumber") who, and who only, in your view, should get ten (10) cents concession from established circular prices.

The desire is to restrict these concessions to the utmost extent practicable, so please drop all names possible. The list finally compiled will be uniform throughout the northern field, so that no company's interests will be prejudiced.

Yours truly,

E. T. BENT, Sec'y.'

(8) That following a meeting of said association called as aforesaid, and held in Chicago, September 26, 1902, the following circular was prepared and sent out by said secretary to said defendant companies and said other coal mining companies represented in said association as aforesaid, to wit:

'NORTHERN ILLINOIS SOFT COAL ASSOCIATION.

CHICAGO, ILL., Sept. 26, 1902.

DEAR SIR: At a meeting held this day the following was unanimously adopted:

Resolved, That prices of association coal, including steam and all other business, except on such continuous sales as are

84     APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

legally or morally binding, effective Oct. 1, '02, and subject to change without notice (quotations to be made Sept. 29, 1902), shall be as follows:

Ottawa.

| | | |
|---|---|---|
| Third Vein Standard Lump | $2 90 | delivered. |
| Chunks | 3 00 | " |
| Streator and Cardiff Standard Lump | 2 80 | " |

Joliet.

| | | |
|---|---|---|
| Third Vein and Wilmington Standard Lump | 2 80 | " |
| Chunks | 2 90 | " |

Streator.

| | | |
|---|---|---|
| Standard Lump | 2 70 | " |
| Chunks | 2 80 | " |

Lemont and Lockport.

| | | |
|---|---|---|
| Standard Lump | 2 40 | mines. |
| Chunks | 2 50 | " |

Chicago.

| | | |
|---|---|---|
| Wilmington (no switching) | 2 75 | delivered. |
| Third Vein and Streator | Open. | |

Rockford and Freeport.

| | | |
|---|---|---|
| Standard Lump | 2 95 | " |
| Chunks | 3 05 | " |

Galena.

| | | |
|---|---|---|
| Standard Lump | 3 40 | " |
| Chunks | 2 50 | " |

Dixon.

| | | |
|---|---|---|
| Standard Lump | 2 90 | " |
| Chunks | 3 00 | " |

Davenport, Rock Island, Moline, Chicago Heights, St. Paul, Minneapolis, Milwaukee and Ft. Madison. } Open.

Clinton, Lyons and Fulton.

Mendota and Amboy.

| | | |
|---|---|---|
| Standard Lump | 3 25 | " |
| Chunks | 3 35 | " |
| Standard Lump | 2 80 | " |
| Chunks | 2 90 | " |

Chicago, Wilmington & Vermillion Coal Co. v. The People.

Lostant.
    Third Vein and Wilmington Stand-
        ard Lump...................... 2 75 delivered.
    Streator and Cardiff Standard Lump 2 60    "
    Chunks ........................... 2 70    "
Rochelle and Malta.
    Standard Lump................... 3 20    "
    Chunks .......................... 3 30    "
Sterling and Rockford Falls.
    Standard Lump.................. 3 00    "
    Chunks ......................... 3 10    "
Aurora.
    Standard Lump.... ............... 3 00    "
    Chunks .......................... 3 10    "
Batavia, DeKalb, Sycamore, Waukegan,
    St. Charles and Geneva.
    Standard Lump................... 3 00    "
    Chunks .......................... 3 10    "
Elgin, Earlville and West Chicago.
    Standard Lump................... 3 05    "
    Chunks .......................... 3 15    "
Belvidere.
    Standard Lump ................... 3 15    "
    Chunks.......................... 3 25    "
Alton.
    Standard Lump................... 2 40 at mines.
    Chunks.......................... 2 50    "
LaCrosse.
    Standard Lump................... 2 40    "
    Chunks.......................... 2 50    "
West Chicago to Belvidere, not inclusive
    and not including Elgin.
    Standard Lump................... 2 40    "
    Chunks.......................... 2 50    "
Crystal Lake to Rockford, not includ-
    ing Rockford, and to Lake Ge-
    neva, inclusive.
    Standard Lump................... 2 40    "
    Chunks.......................... 2 50    "

86    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington &·Vermillion Coal Co. v. The People.

Elsewhere, all lines.

Standard Lump....................  2 40 at mines.
Chunks............................  2 50    "

Mine run coal thirteen cents less than standard lump. Otherwise regulations of circular letter March 26, 1900, continue effective.    The foregoing prices are minimum, and any member is at liberty to charge more for any size at his discretion.

Yours truly,

E. T. BENT, Sec'y.'

(9.)    That following a meeting of said association, called, as aforesaid, and held in Chicago, aforesaid, October 13, 1902, the following circular was prepared and sent out by said secretary to said defendant companies and said other coal mining companies represented in said association, as aforesaid, to wit:

'NORTHERN ILLINOIS SOFT COAL ASSOCIATION.

CHICAGO, ILL., October 13, 1902.

DEAR SIR:    At a meeting held this day the following was unanimously adopted :

Resolved, That prices of association coal, including steam and all other business, except on such continuous sales as are legally or morally binding, effective October 15, 1902, and subject to change without notice, and acceptance of orders to be subject to price ruling on date of shipment, shall be as follows:

Ottawa.

Third Vein Standard Lump and Egg $3 90  delivered.
Chunks............................  4 00    "

Streator and Cardiff.

Standard Lump and Egg..........  3 80    "

Joliet.

Third Vein and Wilmington Stand-
    ard Lump and Egg.............  3 80    "
Chunks...........................  3 90    "
Streator and Cardiff Standard Lump
    and Egg......................  3 70    "
Chunks...........................  3 80    "

Chicago, Wilmington & Vermillion Coal Co. v. The People.

Lemont and Lockport.
    Standard Lump and Egg............ 3 40 at mines.
    Chunks........................... 3 50    "
Chicago.
    Wilmington (no switching).......... 3 75 delivered.
    Third Vein and Streator........... Open.
Rockford and Freeport.
    Standard Lump and Egg........... 3 95    "
    Chunks........................... 4 05    "
Galena.
    Standard Lump and Egg........... 4 40    "
    Chunks .......................... 4 50    "
Dixon.
    Standard Lump and Egg .......... 3 90    "
    Chunks .......................... 4 00    "
Davenport, Rock Island, Moline,  ⎫
Chicago Heights, St. Paul, Min-   ⎬ Open.
neapolis, Milwaukeee and Ft.    ⎪
Madison.                ⎭
Clinton, Lyons and Fulton.
    Standard Lump and Egg .......... 4 25    "
    Chunks.......................... 4 35    "
Mendota and Amboy.
    Standard Lump and Egg .......... 3 80    "
    Chunks ......................... 3 90    "
Lostant.
    Third Vein and Wilmington Stand-
        ard Lump and Egg............... 3 75    "
    Chunks......................... 3 85    "
    Streator and Cardiff Standard Lump
        and Egg..... ................... 3 60    "
    Chunks......................... 3 70    "
Waukegan, Ill.
    Standard Lump and Egg........... 3 40    "
    Chunks.......................... 3 50    "
Rochelle and Malta.
    Standard Lump and Egg .......... 4 20    "
    Chunks.......................... 4 30    "

88    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

Sterling and Rock Falls.
    Standard Lump and Egg .......... ....  4 00  delivered.
    Chunks........ .................  4 10  "
Aurora.
    Standard Lump and Egg ..........  4 00  "
    Chunks.........................  4 10  "
Batavia, DeKalb, Sycamore, St. Charles
  and Geneva.
    Standard Lump and Egg...........  4 00  "
    Chunks..... ...................  4 10  "
Elgin, Earlville and West Chicago.
    Standard Lump and Egg....'........  4 05  "
    Chunks..................... ......  4 15  "
Belvidere.
    Standard Lump and Egg...........  4 15  "
    Chunks..., .....................  4 25  "
Alton.
    Standard Lump and Egg...........  3 40  at  mines.
    Chunks........:................  3 50  "
LaCrosse.
    Standard Lump and Egg...........  3 40  "
    Chunks.........................  3 50  "
West Chicago to Belvidere, not inclusive
  and not including Elgin.
    Standard Lump..................  3 40  "
    Chunks........................ ...  3 50  "
Crystal Lake to Rockford, not including
  Rockford, and to Lake Geneva, inclu-
  sive.
    Standard Lump and Egg...........  3 40  "
    Chunks......................... ...  3 50  "
Elsewhere, all lines.
    Wilmington and Third Vein Stand-
      and Lump and Egg.... ..........  3 40  "
    Chunks.........................  3 50  "
    Streator and Cardiff Standard Lump
      and Egg........................  3 30  "
    Chunks...................... ......  3 40  "

Chicago, Wilmington & Vermillion Coal Co. v. The People.

Mine run coal thirteen cents less than standard lump. Otherwise regulations of circular letter March 26, 1900, continue effective. The foregoing prices are minimum, and any member is at liberty to charge more for any size at his discretion. ·

Yours truly,

E. T. BENT, Sec'y.'

(10)    That following a meeting of said association, called, as aforesaid, and held in the city of Chicago, aforesaid, December 13, 1902, the following circular was prepared and sent out by said secretary to said defendant companies and said other coal mining companies represented in said association, as aforesaid, to wit:

'NORTHERN ILLINOIS SOFT COAL ASSOCIATION.

CHICAGO, ILL., December 13, 1902.

DEAR SIR : At a meeting held this day the following was unanimously adopted :

Resolved, That at the pending annual meeting of the Illinois Coal Operators' Association, this district nominate for its members of the State Executive Committee Messrs. Sweet, Dalzell and Taylor.

Resolved, That at the pending annual election of the Illinois Coal Operators' Association this district urge the re-election of President Garrison and the other existing state officers.

Resolved, That on and after December 16, until further notice, circular prices on association coal, with differentials, as established in circular October 13, 1902, including steam and all other business, except on such continuous sales as are legally or morally binding and subject to change without notice, and acceptance of orders to be subject to prices ruling on date of shipment, shall be $2.90 per ton for Standard Lump and Egg; $3.00 for Chunks and $2.50 per ton for No. 1 Nut at mines; and

Resolved, Further, that no price shall be made for Chicago; that local points in Illinois on the 'Chicago & Alton,' 'Wabash' and 'Santa Fe' be adjusted locally by the shippers in interest, and that all special prices other

90    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

than as above in special list of October 13, 1902, be reduced 50 cents per ton; and

Resolved, Further, that no quotations, as above, be made by mail, word or in person, prior to December 13, 1902.

Yours truly,

E. T. BENT, Sec'y.'

(11) That each of the said defendant companies was represented at one or more of the meetings aforesaid, held on September 26, 1902, October 13, 1902, and December 13, 1902, by duly authorized representatives, and most of said defendant companies have been so represented at several previous meetings since the year 1897; that at said meetings held September 26, October 13 and December 13, 1902, the prices at which soft coal, so mined, as aforesaid, should be sold in the State of Illinois and elsewhere was discussed, and the prices thereof were designated, which it was agreed should be set forth in a circular and forwarded by the secretary, aforesaid, to the said defendant companies, and it was further agreed thereat that said defendant companies should send out to the trade, dealers and consumers of soft coal in the State of Illinois and elsewhere, circulars in conformity to said circular prices and in accordance with the action so taken, as aforesaid.

(12) That after the transmission, as aforesaid, of said resolutions, some of said defendant companies sent out circulars to the trade, dealers and consumers of said soft coal in the State of Illinois and elsewhere, stating the prices at which the said coal, so mined, as aforesaid, by them respectively, would thereafter be sold in said State of Illinois and elsewhere, as aforesaid, said prices mentioned in said circulars being in conformity with those stated in said resolutions.

(13) That all but one, to wit, Bell & Zoller Coal Company, of said defendant companies, and said other coal mining companies represented, as aforesaid, at said meetings of said association, were at the time of the holding of said meetings, as aforesaid, engaged in the business of operating in and mining soft coal in the said State of Illinois, and all of said defendant companies in the selling thereof to con-

sumers thereof in the State of Illinois and elsewhere, which said coal was then and there an article of necessity to the consumers thereof and a commodity and article of merchandise, mined and to be mined, produced and to be produced, and sold, and to be sold upon the market to the public and to consumers thereof in the said State of Illinois and elsewhere.

(14) The defendant corporations include the larger producers in Northern Illinois. The state is divided into nine commercial coal-producing districts, of which the Northern Illinois is called the 'First.' The 'First' district produced during the fiscal year ending June 30, 1902, about 6,000,000 tons out of the 30,000,000 tons produced throughout the State of Illinois during the same time.

This coal is sold in direct competition with other districts of Illinois and Eastern coal.

Over two-thirds of the produce of the First district is sold under contract for the year in competition with other producers thereof to railroad companies at prices affording little or no profit and in some cases at an actual loss.

The cost of mining coal is mainly made up of wages. The wage scale is maintained by reason of selling free coal in the fall and winter at such prices by cooperation between producers in Northern Illinois as can be obtained in competition with other districts and states. The mining rate paid in the First district is the highest in the state.

The First district shipped to Chicago in 1902, 174,210 tons of bituminous coal, out of a total shipment thereto of 8,712,451 tons of coal of all kinds, of which 7,434,613 was bituminous.

July 4, 1897, a national strike of bituminous miners was inaugurated and continued in the First district until December 1, when mining wages were advanced in what is known as the Wilmington field, the Streator field and Third Vein field, both of which are in the First district, aforesaid.

The following January the system of annual trade agreements in the coal mining industry of Pennsylvania, Ohio, Indiana and Illinois was inaugurated, resulting in a reduc-

tion in hours of labor from ten to eight per day, and a further advance in wages on April 1, 1898. These agreements were entered into between the United Mine Workers of America and the Coal Operators at a joint annual convention, composed of representatives from said workers and operators, respectively, in said four states, and like agreements as to wages being binding on miners and operators for the entire fiscal year, beginning April 1 of each year, and subject to no change.

At this time, January, 1898, the Illinois Coal Operators' Association, a state association, to which most of the coal operators in the state belong, was organized for the purpose, and the purpose only, of dealing with organized labor and participating in the interstate joint movement aforesaid.

April 1, 1900, a further advance of wages was fixed by agreement at an annual convention, as aforesaid, for the mining rate in Northern Illinois.

The abnormal demand for coal during the last few months was caused primarily by reason of the strike in the anthracite region, which began May 1, 1902, and ended November 1, 1902. The shortage in production of coal by reason thereof amounted to 25,000,000 tons of anthracite coal, the equivalent of 50,000 tons of bituminous coal.

Whereupon said defendants, and each of them, objected to the introduction of the first thirteen paragraphs as numbered of said agreed statement of facts, and each and every part thereof, on the ground that the same was incompetent, irrelevant and insufficient, which objections the court overruled, and permitted said agreed statement of facts, and each and every part thereof, to be received as evidence in said cause.

To which ruling the defendants, and each of them, then and there excepted.

Which was all the evidence offered or introduced by either party upon the trial of said cause."

At the close of the evidence each of the defendants submitted to the court written propositions and asked the

court to hold the same and each of them as law in this case, and requested the court to mark upon each of them the word "held," in accordance with the statute, etc. But the court refused to consider such propositions, and also refused to mark them "held" or "refused." To which refusal each defendant then and there excepted.

Upon the hearing the court found each of the defendants guilty in manner and form as charged in the indictment, and fixed the punishment of each of the defendants at a fine of $500. Thereupon each of the defendants filed a written motion for a new trial. The court overruled this motion; to which action each of the defendants then and there excepted. These motions are the same, except that each contains the name of the defendant in whose behalf it is filed. Thereupon each of the defendants filed a written motion in arrest of judgment, which the court overruled. To which action each of the defendants then and there excepted. These motions, except as to the name of the defendant presenting the same, are alike.

(The reasons set out as grounds for quashing the indictment, for a new trial, and in arrest of judgment, need not be here stated, as they form the basis of the arguments presented to us for and against the defendants. In so far as we deem them material they will be noticed in the opinion which follows.)

The court thereupon entered a separate judgment against each defendant, finding it guilty of the crime of conspiracy to do an illegal act injurious to public trade upon the indictment in this cause on the said finding of guilty, and that it be and is sentenced to pay a fine of $500, and pay the costs of these proceedings, taxed at $13.18, and that execution issue therefor.

From these several judgments the present writ of error was sued out.

MASTIN & Moss and LAWRENCE & FOLSOM, for plaintiffs in error.

CHARLES S. DENEEN, State's Attorney, and ALBERT C. BARNES, Assistant State's Attorney, for defendant in error.

94    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

MR. JUSTICE BALL delivered the opinion of the court.

It appears from the agreed statement of facts that the association, formed years ago by the defendants and other coal mining companies of Northern Illinois, is a voluntary one. In 1897 it assumed the name of the " Northern Illinois Soft Coal Association," having a president and secretary. Its expenses are paid out of assessments levied upon its members. Its meetings, which were held in the city of Chicago, were called by notices sent out by the secretary. Copies of the proceedings had at each meeting, with a few exceptions, were sent to the several defendants.

At a meeting of the association held March 26, 1900, it was resolved " That the price of mine run coal be ten (10) cents per ton less than standard lump; that when coal is sold through jobbers the shipping company shall see that full circular prices are maintained by said jobbers; that the maximum commission to jobbers shall be ten (10) cents per ton," etc. " That until further action of the association the circular price to dealers be $2.15 for standard lump, and $2.25 for chunks at mines." Then follows directions to the members as to the selection of the retail dealers who are permitted to handle association coal, accompanied by this statement : " The desire is to restrict these concessions to the utmost extent practicable, so please drop all names possible. The list finally compiled will be uniform through the Northern field, so that no company's interests will be prejudiced."

After a meeting of the association held September 26, 1902, under that date the secretary sent out " to said defendant companies and said other coal mining companies represented in said association " a circular, which reads, in part :

" At a meeting held this day the following was unanimously adopted :

'Resolved, That prices of association coal, including steam and all other business, except on such continuous sales as are legally or morally binding, effective October 1, '02, and subject to change without notice (quotations to be made September 29, 1902,) shall be as follows :

Ottawa.

> Third Vein Standard Lump........ $2 90   delivered.
> Chunks ......................... 3 00      "
> Streator and Cardiff Standard Lump  2 80      "   ' "

In this manner the price of coal is set forth and established in some forty other cities and towns in Northern Illinois. The list ends:

" Elsewhere, all lines.

> Standard Lump..................... $2 40 delivered
> Chunks............................ 2 50      "

Mine run coal thirteen cents less than standard lump. Otherwise regulations of circular letter March 26, 1900, continue effective. The foregoing prices are minimum, and any member is at liberty to charge more for any size at his discretion."

At a meeting of the association held October 13, 1902, a similar resolution was adopted, and a like detailed list of cities and towns in Northern Illinois and prices was sent out to the several defendants. This circular closed as follows: "Mine run coal thirteen cents less than standard lump. Otherwise regulations of circular letter March 26, 1900, continue effective. The foregoing prices are minimum, and any member is at liberty to charge more for any size at his discretion."

At a meeting December 13, 1902, the association resolved " that on and after December 16, until further notice, circular prices on association coal with differentials, as established in circular October 13, 1902,  *  *  *  shall be $2.90 per ton for standard lump and egg; $3.00 for chunks, and $2.50 per ton for No. 1 nut at mines; and, resolved further, that no price shall be made for Chicago; that local points in Illinois on the ' Chicago & Alton ' ' Wabash ' and ' Santa Fe ' be adjusted locally by the shippers in interest, and that all special prices other than as above in special list of October 13, 1902, be reduced fifty cents per ton; and resolved further, that no quotations, as above, be made by mail, word or in person prior to December 15, 1902."

96     APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

The statement of facts further shows:

"(1)   That each of the said defendant companies was represented at one or more of the meetings aforesaid, held on September 26, 1902, October 13, 1902, and December 13, 1902, by duly authorized representatives, and most of said defendant companies have been so represented at several previous meetings since the year 1897; that at said meetings held September 26, October 13, and December 13, 1902, the prices at which soft coal, so mined as aforesaid, should be sold in the State of Illinois and elsewhere was discussed, and the prices thereof were designated, which it was agreed should be set forth in a circular and forwarded by the secretary, aforesaid, to the said defendant companies; and it was further agreed thereat that said defendant companies should send out to the trade, dealers and consumers of soft coal in the State of Illinois and elsewhere, circulars in conformity to said circular prices and in accordance with the action so taken, as aforesaid."

That after the receipt of the several circulars some of the defendants sent out their own circulars to the trade, stating the prices of coal as mentioned in the association resolutions.

That all of the members of said association, except the Bell & Zoller Coal Company, during all this time were engaged in mining soft coal and selling it to consumers in the State of Illinois and elsewhere, "which said coal was an article of necessity to the consumers thereof, and a commodity and article of merchandise, mined and to be mined, produced and to be produced, sold and to be sold upon the market to the public and to consumers thereof in the State of Illinois and elsewhere."

And that the defendants include the larger producers of coal in Northern Illinois.

Whether or not a criminal conspiracy upon the part of the defendants is shown by the statement of facts, is a question which was submitted to the consideration of the learned trial judge who heard this cause. He found this issue against the defendants, and we agree with him in that conclusion. If a systematic attempt, covering years

of time, by an association made up of the larger producers of coal in the northern part of the State of Illinois to control the output, sale and price of soft coal in every city and railroad town in that territory "and elsewhere," and to dictate who should and who should not locally handle that coal, be not criminal in its character, then pools, trusts and combinations have nothing to fear from the law.

The defendants presented to the trial court twenty-two written propositions of law to be by him marked " Held " or " Refused." He did neither. This non-action upon his part is claimed to be reversible error. Assuming that the court in a criminal case submitted for trial without a jury is governed by section 41 of the Practice Act, (a question we do not decide,) the effect to neglect to mark the propositions presented is the same as if each of them was marked " Refused." Calef v. Thomas, 81 Ill. 487. The defendants do not discuss the law as laid down in these propositions, but confine their argument to the supposed error in refusing to consider them. In such case it is not our duty to search them for possible errors in law. They stand before us as " refused." Every statement of law contained in these propositions is repeated in the motions to quash and in the motions in arrest of judgment. Hence these propositions need not be set out herein nor be considered separately, since, if neither of the above motions is well founded, the trial court did not commit error in this regard.

The grand jury which found this indictment made a written report to the Criminal Court concerning the respective amounts of hard and of soft coal received in the city of Chicago during the year 1902, and their deductions therefrom. We are asked to take judicial notice of that report and to consider its contents in our efforts to reach a proper conclusion in this case. We cannot so do. Such report is the voluntary act of the grand jury, for which there is no authority in the law. That body performed its whole duty when it passed upon all criminal cases of which it had knowledge, and returned to the court all the true bills it found. The indictment is the completed act of the

98    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

grand jury; and that paper stands upon its merits or falls because of its demerits, wholly uninfluenced by any report, written or verbal, which the "accusing jury" may make to the court under whose guidance it has performed its labors. This rule of exclusion of that which is immaterial is carried so far that the United States courts refuse to look into the debates in Congress in search of information as to the meaning of the language of a statute passed by that body. U. S. v. Freight Association, 166 U. S. 318.

The objection made by the defendants to the introduction in evidence of the first thirteen paragraphs of the statement of facts, because the means employed by the defendants in carrying out the object of the conspiracy are not set forth in the indictment, cannot be sustained. As will be shown hereafter, the offense of conspiracy to do an unlawful act is complete when the agreement is entered into. Hence it is not necessary to state in the indictment the means by which the conspirators intended to accomplish their unlawful object. While this is true, it does not relieve the state from the necessity of showing that the conspiracy existed; and therefore any acts of the defendants which fairly tend to establish the conspiracy, done and performed by them in furtherance of the object of their conspiracy, may be offered and received in evidence.

The defendants are not profited by the apparently voluntary nature of the association, nor by its lack of stringent by-laws, or want of penalties as against any offending member. The law discerns reality through whatever disguises it may assume. When inexperienced men form a combination to control a necessary of life they are very apt to furnish in the written agreement to combine all the evidence needed to convict them of this offense. But those who have seriously studied the subject do not make this mistake. Little can be learned from their admissions, written or otherwise. The evidence of combination, if there be such, must be gleaned from their conduct. The test is not what the agreement professes, but what it accomplishes. Proof of an agreement actually entered into is not necessary.

A mere tacit understanding between conspirators to work to a common purpose is all that is essential to a guilty actionable combination. Patnode v. Westenhaver, 114 Wis. 460. " It makes no difference that the agreement for the illegal combination is not a formal written agreement. It may be a verbal agreement or understanding, or a scheme not embodied in writing, but evidenced by the action of the parties." Harding v. Am. Glucose Co., 182 Ill. 551.

The contention that the prosecution has not shown that the acts of the association were assented to by each defendant, and that therefore the findings of guilty cannot be sustained, is not well taken. The statement of facts shows three meetings of the association in 1902, at all of which the prices of soft coal were discussed and fixed, and it was ordered at each of such meetings that these prices should be sent out to the trade. The results of these meetings were sent to each defendant by their secretary, and many of the defendants sent out circulars to their local agents containing the same information. All of the defendants were members of the association in 1902, and had been such for some years previous to that date. Each defendant was represented by its duly authorized representatives at one or more of these meetings. Each and every of the defendants obeyed the resolutions passed at these meetings. Under these circumstances, and under an unbroken line of authorities extending back for 200 years, it is now too late successfully to assert that each member of this association and conspiracy is not bound by the acts of all its fellows done in furtherance of the object to accomplish which the combination was formed. When a combination and conspiracy is shown, the law does not individualize. Responsibility rests upon each for the acts of his fellows which tend to advance the purposes of the combination. " When two or more conspire together to commit an actionable wrong, everything said, done or written by any one of them in execution or furtherance of their common purpose, is deemed to be so said, done and written by every one, and is a relevant fact as against each." Hamilton v. Smith, 39 Mich.

100 APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

231. See also, Lasher v. Little, 202 Ill. 551; Cooley on Torts, 127; U. S. v. Cassidy, 67 Fed. Rep. 693; Spies v. People, 122 Ill. 226; Doremus v. Hennessy, 176 Ill. 608; Hawarden v. Coal Co., 111 Wis. 545; London v. Horn, 206 Ill. 493 (in which Allen v. Flood, 67 L. J. Q. B. 119, is disapproved).

Counsel for defendants say that the association did not fix prices for soft coal until after the passage of the Act of 1897, with its *proviso* relating to wages, and they interpose that *proviso* as a shield against this prosecution. There are two answers to this contention: *First*, there is no evidence to show that the association or its members were moved to fix such prices and to decide who should handle their product by any sympathy for the workman, or by any desire to raise his wages, or with any intention of carrying this *proviso* into effect. It is true that at such meetings "discussions were had and resolutions passed respecting the subject of wages, transportation and prices" at which the defendants should sell their coal; but in none of the resolutions adopted, nor in any of the circulars sent out is the question of wages referred to. It is well known that such corporations are not organized or run as eleemosynary institutions, and that benevolence is not a necessary element in the mining and sale of coal by corporate bodies. Hence it is not strange that the learned trial judge found the evidence in this record insufficient to acquit the defendants of the offense charged, on the ground that "the principal object or effect" of the association and of its acts "was to maintain or increase wages;" nor that we agree with him in that conclusion. The scope of the agreement, not the possible self-restraint of the parties to it, is the test of its validity. The parties to this combination had the power to raise the price of soft coal within the territory over which it operated. Cummings v. Union B. S. Co., 164 N. Y. 401; Craft v. McConoughy, 79 Ill. 346; Morris Run C. Co. v. Barclay C. Co., 68 Pa. St. 173. *Second*. The *proviso* never was the law. In The People v. Butler S. F. Co., 201 Ill. 257, the Supreme Court held it to be unconstitutional, "as being an

unlawful discrimination in favor of the persons sought to be exempted by the amendment from the operation of the Act of 1891, as amended by the Act of 1893." The defendants cannot use a law " that never was" as a shield to protect them against liability for acts which are forbidden by law. "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is in legal contemplation as inoperative as though it had never been passed." Norton v. Shelby Co., 118 U. S. 425–442.

The defendants assert that the trial court erred in overruling the motion to quash the indictment, and also in overruling the motion in arrest of judgment.

It is urged (1) that the indictment does not charge nor does the agreed statement of facts establish a criminal conspiracy at common law, and therefore counts 2 and 4, each of which alleges a common law offense, cannot be sustained; (2) that the indictment does not charge nor does the agreed statement of facts establish a criminal conspiracy under the law of 1874, and therefore counts 1 and 3, drawn over that statute, cannot be sustained; and (3) that the fifth count of the indictment, which follows the wording of the Act of 1891, cannot be sustained because it does not allege (nor was it proved) where the defendants severally were incorporated; and because the form of the action should be debt, and not by indictment.

If there be one count in this indictment sufficient to sustain the sentence and judgment of the court, it makes but little difference either to the People or to the defendants, in what manner the remaining counts are disposed of. Hazen v. Com., 23 Penn. 366. If there be one good count in the indictment, a general finding that the defendant is guilty will not be disturbed because the indictment contains other counts which are bad. Duffin v. People, 107 Ill. 119; Lyons v. People, 68 Ill. 276.

To determine the issue here presented it is necessary to ascertain the common law rule governing combinations intended to fix the price or to control the market of any necessary of life.

102   APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

In King v. Norris, 2 Kenyon's Notes of Cases, 300, decided in the King's Bench by that great common law judge, Lord Mansfield, it is said: "This was a motion for leave to file an information against the defendants, who were separate proprietors of salt works at Droitwich, for a conspiracy to raise the price of salt there, by entering into an article, whereby they bound themselves, under a penalty of £200, not to sell salt under a certain price, which exceeded the price then received for it. * * * The articles were now cancelled and destroyed; but notwithstanding that, the court were unanimous for making the rule absolute; and Lord Mansfield declared, that if an agreement was made to fix the price of salt, or of any other necessary of life (which salt emphatically was) by people dealing in that commodity, the court would be glad to lay hold of an opportunity, from what quarter soever the complaint came, to show their sense of the crime, and that at what rate soever the price was fixed, high or low, made no difference, for all such agreements were of bad consequence and ought to be discountenanced. He mentioned an indictment upon one of the last home circuits against the bakers of the Town of Farnham for such an agreement."

In Mitchel v. Reynolds, 1 Peere Williams, 181, 197 (decided in 1711), Parker, C. J., declared that "in all restraints of trade, where nothing more appears, the law presumes them bad."

In State v. Buchanan, et al., 5 Harris & J. (Md.) 259, decided in 1821, the defendants were indicted in one count for an executed conspiracy to cheat and defraud the president, directors and company of the Bank of the United States, and in a second count for a conspiracy only to cheat and defraud the same parties. The defendants' demurrer was sustained by the trial court; whereupon the State took the case to the Court of Appeals by writ of error. Counsel for the State, in support of the propositions that conspiracy was an offense at common law, that the statute *de conspiratoribus*, passed in the thirty-third year of the reign of Edward I., did not introduce a new rule, but merely was

in affirmance of the common law, and that the *gravamen* of the offense consisted in the unlawful combination or confederacy to injure a third person, cited more than eighty English cases decided and text books published before the revolution; and *Buchanan*, Judge, after reviewing nearly all of these authorities, finds by a course of decisions running through a space of more than four hundred years, without a single conflicting adjudication, nine points clearly settled.    Of these we cite, in effect, the following :    That the offense of conspiracy is of common law origin, and is not restricted or abridged by the statute 33 Edward I.; that a conspiracy to do any act that is criminal *per se* is an indictable offense at common law; that an indictment will lie at common law    *    *    *    for a conspiracy to do an act not illegal nor punishable if done by an individual, when done by the conspirators to effect a purpose which has a tendency to prejudice the public; that a conspiracy is a substantive offense and punishable at common law though nothing be done in execution of it—the conspiracy being the gist of the offense; that in a prosecution for a conspiracy it is sufficient to state in the indictment the conspiracy and the object of it, and that the means by which it was intended to be accomplished need not be set out, being only matters of evidence to prove the charge, and not the crime itself, and may be perfectly indifferent. The learned judge then goes on to say (p. 352) :    " From all which it results that every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious, or corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is at common law an indictable offense, though nothing be done in execution of it, and no matter by what means the conspiracy was intended to be effected; which may be perfectly indifferent, and makes no ingredient of the crime, and therefore need not be stated in the indictment."

In King v. Eccles, 1 Leach Crim. Cases, 274, the defendants were charged with a conspiracy by wrongful and indirect means to impoverish Booth, a tailor, and to hinder

104      APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

and to prevent him from following his trade; but the acts done or intended to be done were not set out in the indictment. Upon this objection being made, the court declared that the offense did not consist in acts done or agreed to be done, but that the offense was the conspiracy and the object of it; and that therefore the acts need not be stated in the indictment, since the means adopted " were only matters of evidence to prove the charge and not the crime itself."

·When our forefathers came to America they brought with them their rights and privileges as free men, and *per* consequence they also brought with them all the laws and customs of England suitable to their new surroundings and necessary for the preservation of those rights and privileges. Such was the understanding and rule of the English colonists; and each state settled by them or by their descendants, in due time, and except as modified by constitution or statute, has so declared. Boyer v. Sweet, 3 Scam. 119. Our statute adopts the common law so far as the same is applicable to our society and institutions, and all the statutes or acts of the British Parliament made in aid and to supply the defects of the common law prior to the fourth year of James I. (except three chapters specifically mentioned) which are of a general nature and not local to that Kingdom. R. S., Hurd, ch. 28. Hence we must look to the acts of Parliament enacted and to the judicial decisions handed down prior to the fourth year of James I. for evidence of what the common law is. An examination of them shows that the points made and the conclusion reached by the learned judge in The State v. Buchanan, *supra*, are clear and correct statements of the common law concerning conspiracy as it existed at the time from which we adopted the same.

In Smith v. People, 25 Ill. 9, the defendants were indicted and convicted of a conspiracy to seduce a minor female. The indictment did not set out the means resorted to. Upon error to the Supreme Court it is said : " To attempt to define the limit or extent of the law of conspiracy, as deducible from the English decisions, would be a

difficult, if not an impracticable task, and we shall not attempt it at the present time.    We may safely assume that it is indictable to conspire to do an unlawful act by any means, and also that it is indictable to conspire to do any act by unlawful means.    In the former case it is not necessary to set out the means used, while in the latter it is, as they must be shown to be unlawful."    To the assertion of counsel for the defendants that the term "unlawful" means "criminal," the court said that by the common law governing conspiracies, the term is not so limited; and that it was not necessary in such a case to show that the means to be used by the conspirators were unlawful or criminal.

To the proposition that this offense was but a common law offense, and is not punishable in Illinois where we have a criminal code defining most criminal offenses and prescribing their punishment, the court answered that our criminal code prescribes punishment for offenses not enumerated, which can mean nothing other than common law offenses; thus showing conclusively that it was not the intention of the legislature to repeal that portion of the common law by implication; and reference is made to Johnson v. The People, 22 Ill. 314, where that question is decided.

"Where the object (of the conspiracy) is unlawful, the means by which it is to be accomplished are not material ingredients in the offense; and therefore in such a case it is never necessary to set them forth.    The offense is complete the moment the conspiracy is made, whether any acts be done in pursuance of it or not.    Such acts form no part of the offense, and the statement of them in the indictment is but surplusage."    Hazen v. Com., 23 Penn. 355.    See also, State v. Noyes, 25 Vt. 415.

In Thomas v. People, 113 Ill. 531, which was an indictment for a conspiracy to wrongfully obtain the goods of another, it was urged that the indictment was insufficient because it failed to set out the means used by the defendants.    The court said :    "The first count, under the ruling in this state, whatever may be decided elsewhere, is clearly good.    To obtain goods by false pretenses is, to every ap-

106     APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

prehension, an illegal act; and the rule here is, where the act to be accomplished by the conspiracy is illegal, it is unnecessary to specify the means by which it was intended to be accomplished."

"The offense of conspiracy was complete at common law on proof of the unlawful agreement. It is not necessary to allege or prove any overt act in pursuance of the agreement." People v. Sheldon, 139 N. Y. 265. "The word illegal used in the statute is synonymous with unlawful, and means contrary to any law, whether criminal or civil." O'Donnell v. People, 110 Ill. App. 250, 263, and authorities cited. See also, State v. Parker, 43 N. H. 83; Ry. v. Warburton L. R., 1 C. C. 276; Bishop's Directions and Forms, sec. 283; Bishop v. Am. P. Co., 157 Ill. 284. Every misdemeanor is a crime. Van Meter v. People, 60 Ill. 170.

Counsel for defendants cite authorities from other jurisdictions to show that the word "illegal" as used in the statute means "criminal" or "unlawful" as distinguished from "void" or "non-enforceable." Such authorities are entitled to great consideration as the settled conclusions of learned men upon questions which they have seriously considered, but they are not to be followed by us when such conclusions are adverse to the decisions of our Supreme Court, since the latter are final and are binding upon us.

From what has been said it appears that the combination shown in the statement of facts and found by the trial court to exist in this case was and is forbidden and punishable by the common law. Such a combination has a tendency to diminish production, to limit competition, and to enhance prices. The defendants are not aided by the fact, if it be a fact, that the prices fixed by the association were fair and reasonable, (Gibbs v. McNeeley, 118 Fed. Rep. 120, and cases cited; Harding v. Am. Glucose Co., 182 Ill. 619; People v. Milk Exchange, 145 N. Y. 273;) or that the association had not in fact advanced the price of coal. That policy may not have been necessary to crush competition. Richardson v. Buhl, 77 Mich. 660; U. S. v. Freight Ass'n, 166 U. S. 324; State v. Standard Oil Co., 49 Ohio 186.

Chicago, Wilmington & Vermillion Coal Co. v. The People.

"All combinations among persons or corporations for the purpose of raising or controlling the prices of merchandise or any of the necessaries of life, are monopolies, and ought to receive the condemnation of all courts." Richardson v. Buhl, *supra;* see also, Arnot v. Pittston & E. C. Co., 68 N. Y. 565; India B. Co. v. Kock, 14 La. Ann. 168.

The first count of the indictment is based upon section 46 of the Criminal Code. It plainly sets out a combination and conspiracy upon the part of the defendants wrongfully, fraudulently and maliciously to regulate, and fix the price at which coal should be sold in the State of Illinois. The charge follows the wording of the Act so closely that the defendants cannot consistently complain that they were surprised on the trial, or were unable to prepare for their defense by reason of any uncertainty or want of particularity in that regard. Further strictness in pleading is unnecessary. Cannady v. People, 17 Ill. 160; Williams v. People, 67 Ill. App. 345; Cole v. People, 84 Ill. 216.

But it is said that a criminal intent upon the part of the defendants is not alleged in this count; that such intent is material, and therefore the count, lacking this allegation, is fatally defective. This contention is based upon the words "with the fraudulent and malicious intent," which appear in the first part of the section. Five separate offenses are named in this section. The first, "to injure the person, character, business or property" of another, may or may not be a misdemeanor. That depends upon the intention of the accused. Under certain conditions it is admissible and not unlawful to thus injure another. Hence when that offense is charged the intent of the defendant is material and must be alleged and proved. Bishop's Directions & Forms, sec. 301. The remaining four offenses are in themselves illegal and criminal, and have always been so at common law. If a conspiracy to do an illegal act be set forth in an indictment, the charge is complete without the addition of words alleging a criminal intent in the doing of the act. In stating such an

108    Appellate Courts of Illinois.

Vol. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

offense the criminal intent appears *prima facie* in the statement of the act itself. 1 Bish. N. Crim. Proc., sec. 521, pars. 3 and 4.

But if such intent should be alleged, the count sets forth that the act was done " unlawfully, fraudulently, maliciously, wrongfully and wickedly," thus clearly charging the intent of the defendants in the formation of the conspiracy and in the objects for which it was created. The terms of the statute are " wrongfully and wickedly." An indictment which alleges that the conspiracy was thus entered into is good, even in those cases where the object for which the combination was formed was not unlawful until forbidden by the statute. .Ulery v. Chicago L. S. Ex., 54 Ill. App. 240. It follows that this count is good if section 46 is still in force. It is not asserted that this section is expressly repealed, but it is said that it is abrogated and superseded by the Act of 1891 by implication. The rule is that when there is a clear repugnance between two laws, and the provisions of both cannot be carried into effect, the latter law must prevail as the last expression of the legislative will. Sullivan v. People, 15 Ill. 234; Devine v. Board of Com'rs, 84 Ill. 590. Also, if a subsequent statute revises the whole subject of a former one, and is intended as a substitute for it, it operates as a repeal of the former, although it contains no express words to that effect. People v. Town of Thornton, 186 Ill. 162. Repeals by implication are not favored. Had the legislature thought section 46 covered the entire ground of conspiracy relating to injuries of the public trade, they would not have passed the Anti-Trust Act of 1891. Had they thought that the latter Act covered every offense provided for in section 46, we would expect them to repeal the latter section in express words. This they did not see fit to do. Where the legislature neglects to act in such case the courts are slow to declare the first law to be abrogated and superseded by the second. We do not think there is such a repugnancy between these two acts as will warrant us in deciding that section 46 stands repealed. When the common law and a

statute differ, the common law gives place to the statute only where the latter is couched in negative terms, or where its matter is so clearly repugnant that it necessarily implies a negative. Black. Com. 89.

But if it were true that section 46 is repealed by the Act of 1891, the third count sets up the same facts as are contained in the first count, with the conclusion that they are "contrary to law." The first count is drawn over section 46, while the third count is framed at common law. If the facts charged in these counts are sufficient, and we hold that they are, then it is immaterial whether section 46 is or is not in force. The defendants must respond to one or the other of these two counts.

Counsel seem to infer that because certain conspiracies are legislated against, that the common law concerning conspiracies is abolished in this state. However this might be did our Criminal Code cover the *entire* ground of conspiracy, it is clear that it does not. That a conspiracy to commit any felony is indictable at common law was never questioned. This is also true of many misdemeanors. The adoption of a statute with reference to a crime does not abolish the doctrines and practice of the common law in relation thereto so far as that crime is not covered by the act. Wherever the statute has not in express words defined the crime and fixed the punishment, the common law remains in full force and vigor; and if it be abated by statute, when that statute is repealed it springs up anew, ever ready to protect the law-observing citizen from the evil designs of the law breaker. People v. Buchanan, 5. Harris & J. 259, *supra.* It cannot be supposed that by such repeal the law-making power intended to extend perfect immunity thereafter to those who should commit that crime. State v. Rollins, 8 N. H. 550; State v. F. F. Company, 49 N. H. 240. But we need not go so far as this argument implies. Where the statute is not repugnant to the common law, the latter is not abrogated, in the absence of express words, or of affirmative implication repealing the common law.

"It is every-day practice in the criminal courts to pro

110    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

ceed against offenders, either under a statute or at the common law, as the prosecuting power elects.   Even where an indictment is meant to be drawn on a statute, if it proves defective as such, yet is good at the common law, it stands —the court rejecting the concluding words, 'against the form of the statute' as surplusage."   Bishop on Stat. Crimes, sec. 164, also notes to same.

In State v. Norton, 3 Zab. (N. J.) 33, where a conspiracy statute did not contain a clause repealing the common law, it was held that the common law offense of conspiracy is not abolished by such statute, but that every conspiracy which was indictable at common law before the passage of the act is still indictable.   That the law-making power did not intend to do away with common law conspiracies when it passed section 46, is shown in the latter part of the section, providing punishment, which reads, "and every such offender * * * and every person convicted of conspiracy at common law, shall be imprisoned," etc.   This statute is either declaratory of the common law, or it is in addition thereto.   In either case, it leaves the common law in full force outside of the express provisions of the act.

The contention that the indictment should allege and the facts prove that the defendants were incorporated under the laws of this state, or under the laws of some other state or country, for the purpose of doing business in this state, is answered by the words of the statute.   The clear intention of the phrase " any corporation organized under the laws of this or any other state or country for transacting or conducting any kind of business in this state," is to include all corporations, wherever created.   Hence the place of organization is immaterial, and therefore allegation or proof thereof is unnecessary.   The " transacting or conducting any kind of business in this state " must be read in the light of the object of the statute, which is to prevent the forming of pools and combinations in this state for the purposes named in the Act by any and all corporations, wherever organized.   To hold that the corporation created outside of this state, without being given specific power to do business

in this state, may, by virtue of the lack of that specific power, come here and violate the statute and be immune from punishment, is a legal absurdity which is not to be tolerated. Sections 7a and 7b of the Act of 1891 show that what is referred to is the doing of business in this state. " It is the settled doctrine of this state, established by many decisions of this court, that foreign corporations do not come into this state as a matter of legal right, but only by comity, and that said corporations are subject to the same restrictions and duties as corporations formed in this state, and have no other or greater powers." Harding v. American G. Co., 182 Ill. 635.

Counsel for defendants say that any one may lawfully fix the price at which he will sell his product, or he may lawfully refuse to sell it at any price. This is true. The injury to the public, if any, from the acts of an individual are infinitesimal; and in the long run they correct themselves. Hence the law places few restrictions upon a man in the management of his own affairs. But " men can often do by the combination of many, what severally no one could accomplish, and even what when done by one would be innocent." Morris Run v. Barclay, *supra*. Whenever the act to be done by such a combination necessarily tends to prejudice the public or to oppress individuals, the combination has always been held to be criminal. " There is a potency in numbers when combined, which the law cannot overlook where injury is the consequence." Morris Run v. Barclay, *supra*. See also, People v. Chicago G. T., 130 Ill. 297; State v. Burnham, 15 N. H. 396; Com. v. Carlisle, Brightley (Pa.) 40; Northern Securities Co. v. U. S., Supreme Court of the United States, opinion delivered March 14, 1904, and cases therein cited.

Defendants say that an action of debt for the recovery of the penalty prescribed by the statute, and not an indictment, is the proper remedy against a corporation charged with a violation of the Anti-Trust Law of 1891. Section 1 of that Act declares that if any corporation, person, partnership or association shall enter into a pool or combination to regulate

112    Appellate Courts of Illinois.

Vol. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

or fix the price of any article of merchandise or commodity, etc., he or they shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to indictment and punishment as provided in this Act. It follows that the doing of the forbidden act is a criminal offense, and it is expressly declared that the prosecution therefor shall be by indictment.

It is true that section 7 says that "the fines hereinbefore provided for *may* be recovered in an action of debt." The word "may" in this section is used in its permissive sense. To hold otherwise would violate the meaning of the words "and be subject to indictment" contained in section 1. It is true that "may" oftentimes means "must;" but it always retains its primitive meaning unless common fairness and the rights of parties litigant demand that it be supplanted by "must;" or unless it is used in a sentence which creates an exception in favor of the public. In this statute its meaning is plain. By its use the law-making power intended to give the people an election of remedies. Fowler v. Pirkins, 77 Ill. 271.

A pool or trust is a combination having the intention and power, or tendency, to monopolize business, or to control production, or to interfere with trade, or to fix and regulate prices, and the like. The primary object of a pool or trust is to secure a monopoly, since from that point of advantage it can destroy its competitors, and can control production, sales and prices. However, in practice, a pure monopoly, except in an extremely limited territory, is never reached. Nor does the law call for proof of monopoly in order to declare such combinations unlawful. The statement of facts herein shows that this association is wide in its scope, general in its control of the production and sale of soft coal over the greater part of Northern Illinois, and injurious in its effects upon the consumer and the general public. These things made it an unlawful combination, notwithstanding its control of the product of the market was not exclusive. Cummings v. Union B. S. Co., 164 N. Y. 401.

The statute of 1874 says: "If any two or more persons

conspire," etc. The Act of 1891 declares, " If any corpora-
tion   *   *   *   shall create, enter into or become a member
of or a party to any pool, trust," etc. Under these statutes
it is obviously immaterial whether or not the restraint be
general or partial. The application 'of the rule does not
depend upon the number of those who may be implicated,
nor the extent of territory covered by the combination; but
does depend upon the existence or the non-existence of a
tendency to injure the public. Nester v. Cont. Brew. Co.,
161 Penn. 473.

In More v. Bennett, 140 Ill. 69, it is held as follows :
" True, the restraint is not so far-reaching as it would have
been if all of the stenographers in the city had joined the
association, but so far as it goes, it is precisely of the same
character, produces the same results, and is subject to the
same legal objection.   *   *   *   We can see no legal differ-
ence between the restraint upon competition which it now
exercises and that which it will exercise when it is in a
position to dictate terms to all who are engaged in the
business, and to all who may wish to obtain the services of
law-stenographic reporters."

" To render the contract void it is not necessary that it
should create pure monopoly. It would seem that the
agreement may be illegal if the natural or necessary conse-
quences of its operation are to prevent competition and
create fictitious prices independent of the law of demand
and supply, and to such an extent as to injuriously affect
the interests of the public or the interests of a particular
class of citizens who may be especially interested, either as
producers or consumers, in the articles or staples which are
the subject of the restriction imposed by the contract."
Texas Standard O. Co. v. Adoue, 83 Tex. 650.

In Foss v. Cummings, 149 Ill. 353, twelve persons and
firms formed a combination to force up the price of corn
upon the Chicago market. With this object in view they
purchased large amounts of May corn and withheld it from
the market. The tendency of this action was to advance
the price of one of the necessaries of life, and to compel

114    APPELLATE COURTS OF ILLINOIS.

VOL. 114.] Chicago, Wilmington & Vermillion Coal Co. v. The People.

consumers to pay an unnatural price therefor. The adventure proved to be a losing one. Appellants brought assumpsit against others of the combination to recover moneys paid out, etc., in the transaction. Upon the trial the nature and object of the combination were disclosed. The trial court held the law to be that if the combination was entered into for the purpose of advancing the price of corn above what it would be if left free from manipulation, appellants had no right of recovery. The Supreme Court, upon appeal, declare this to be the law. They cite 9 Am. & Eng. Ency., 895, with approval. " All compacts between merchants, speculators or any class of men to elevate or depress the market are injurious to the public interest and in restraint of trade. When such a purpose is apparent in a contract, it strikes the agreement with nullity. Such a combination of dealers is nothing less than a conspiracy against trade, entered into for selfish purposes, and tending to make the poor poorer and the rich richer. Whether the design is to bring down the price of any commodity to a point below its value in a fair and open market, or to raise it above its true worth, the illegality of the combination is the same. Such designs will not be furthered by the courts, though there may be circumstances under which the object of such a contract does not sufficiently appear to expose the illegality. If the true character is known, the contract will be held void." The court then says : " It makes no difference that the agreement is only in partial restraint of trade. If the public is injuriously affected (and that is necessarily so when the combination tends to increase the price of a commodity in general use), it is illegal."

" Again, all the authorities agree that in order to vitiate a contract or combination, it is not essential that its results should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." U. S. v. Knight, 156 U. S. 16, cited and followed in Addyston P. & S. Co. v. U. S., 175 U. S. 211.

" To vitiate a combination such as the (anti-trust) Act of

Congress condemns, it need not be shown that the combination, in fact, results or will result in a total suppression of trade or in a complete monopoly, but it is only essential to show that by its necessary operation it tends to restrain interstate or international trade or commerce, or tends to create a monopoly in such trade or commerce, and to deprive the public of the advantages that flow from free competition." Northern Securities Co. v. U. S., Supreme Court of the United States, *supra*.

In Morris Run Coal Co. v. Barclay Coal Co., 68 Penn. 186, the combining companies did not include all the coal producers of the district in which they operated, and yet it was held that as the tendency of the association was to prejudice the public or to oppress consumers by unjustly subjecting them to the power of the confederates, the combination was criminal.

In the city of Memphis the master plumbers formed an association, one of the by-laws of which required each member to pay to the association a certain penalty upon all work done in competition with another member. Under this by-law Bailey, a member, owed the association $444, for which it brought suit. It was shown that the demand had no other basis than that by-law. Hence the question arose, is that by-law valid or invalid? The court held that it was destructive of free and natural competition among members, tended to the arbitrary and unreasonable increase of prices to customers, and therefore was contrary to public policy and void under the common law. The court add : " It is not the number of persons participating in the by-law, or the extent of the territory included, but the injury to the public in that territory, however restricted, that characterizes the interruption of trade as illegal." Bailey v. Master Plumbers' Association, 103 Tenn. 99.

The majority, but not all, of the manufacturers of salt in the valleys of the Muskingum and Hocking rivers entered into an association, the objects of which were to control the prices and grades of salt made by them. Other salt makers sold their product in the localities where the association

operated. Suit was brought to enforce the association agreement. The defense was that the agreement was unlawful. The court said: "It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to enquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public." Salt Co. v. Guthrie, 35 Ohio St. 666, 672.

"All the cases, ancient and modern, agree that a combination, the object of which is to prevent general competition and to control prices, is detrimental to the public, and consequently unlawful." People v. N. River S. F. Co., 2 L. R. A. 40.

The combination in this case threatened a practical monopoly in an article necessary to the home comfort and to the business success of the individual. Its combined weight and power compelled the consumer to comply with its demands. Its acts tended to increase the price of an article of prime necessity in general use. Such a combination is forbidden by the common law and by the statute as being a conspiracy in restraint of trade.

Finding no reversible error in this record, the judgment of the Criminal Court as to each of the plaintiffs in error is affirmed.

*Affirmed.*