## STATE *v.* EASTERN COAL COMPANY *et al.*

### JUNE 29, 1908.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1) *Criminal Conspiracy. Monopolies. Engrossing. Common Law Offence. Criminal Pleading. Fixing Price of Prime Necessity of Life.*

Criminal conspiracy is a confederation to do something unlawful, either as a means or an end.

If a person, natural or artificial, can lawfully control or fix the price at which coal shall be sold within the limits of a city, then a number of persons can lawfully combine for that purpose; but if not, then it becomes a crime to confederate for the purpose of accomplishing such unlawful act.

No person can *control, regulate,* or *fix* the price at which an article shall be sold without having complete dominion and control of the article. He must have obtained a monopoly.

As coal is an article of prime necessity in this part of the country, it is legally capable of being engrossed, and engrossing is an offence at common law in this State.

While our history does not disclose any prosecutions for such offence, and it may be considered as dormant, yet when it becomes necessary the law relative thereto will be applied with due regard to the circumstances and conditions existing at the time of its enforcement.

The danger to be apprehended from engrossing is monopoly, and monopoly embraces any combination the tendency of which is to prevent competition in its broad and general sense and to control prices to the detriment of the public.

A charge of conspiracy that defendants combined to exercise a certain power must proceed upon the assumption that they have or will have the power to be exercised. The gravamen of the offence, however, consists in combining to acquire the power, whether it shall be exercised or not.

Indictments against defendants for conspiracy, not directly charging defendants with conspiring to create a monopoly in order to regulate and fix the price of coal, but charging a combination to do something that could only be done through a monopoly, and so charging the conspiracy to create a monopoly merely by implication, intendment, and inference, held defective, in that the indictments did not show that defendants were dealers in coal or otherwise had any power to regulate and fix the price thereof or to restrain trade therein; 2, that they did not show that defendants conspired to create a monopoly in coal; 3, that they did not sufficiently set forth either the means or the purpose of the alleged combination; 4, in not setting forth the alleged agreement or combination with sufficient precision:—

*Held,* further, that the indictments were not insufficient in that it did not appear that the conspiracy was to raise the price or fix a price that was unlawful, exorbitant, unwarranted, or oppressive.

*Held,* further, that, if the offence had been set out with proper particularity in other respects, the indictment would not be insufficient in that it did not appear that the alleged agreement to fix and regulate the price was for any appreciable time or was an agreement binding upon any of the parties thereto, since the duration of the illegal contract was not of the essence of the crime.

A corporation can commit the crime of conspiracy.

INDICTMENTS charging conspiracy, on facts fully set out in opinion. Certified from Superior Court, under C. P. A., § 478.

DUBOIS, J. These are indictments charging the defendants with conspiracy. The cases were heard together, and came to this court upon certifications from the Superior Court for the counties of Providence and Bristol, under C. P. A., § 478.

The material portions of the four counts in each of the indictments set out that the defendants "unlawfully and fraudulently did combine, confederate and conspire together by divers unlawful and fraudulent devices, contrivances and acts, unlawfully to regulate and fix the price at which coal should be sold in the said City of Providence, to the prejudice of the public and of the consumers of said coal, which said coal was then and there an article of prime necessity to the public and the consumers thereof ;" and that the defendants "wilfully devising and intending to regulate and fix the price of a prime necessity of life in said City of Providence, did unlawfully and maliciously conspire, combine, confederate and agree together to do an illegal act injurious to the public trade in reference to a prime necessity of life, to wit, to then and there, in restraint of trade and to the injury of the public trade, unlawfully create, enter into and become members of and parties to a trust, agreement, combination, confederation and understanding, with each other wrongfully and unlawfully to regulate and fix the price at which coal should be sold in the City of Providence, which said coal was then and there an article of prime necessity to the public and consumers thereof; " and also that the defendants "unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to wit, to then and there unlawfully regulate

and fix the price at which anthracite coal should be sold in the City of Providence, which said anthracite coal was then and there an article of prime necessity to the Public and the consumers thereof, and that the defendants did unlawfully and fraudulently fix and regulate the price of anthracite coal in said City of Providence;" and finally, that the defendants "unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to wit, to then and there unlawfully regulate and fix the price at which coal should be sold in said City of Providence, which said coal was then and there an article of prime necessity to the said public and consumers thereof."

The following are the questions certified for our determination:

" 1.    Is said indictment insufficient in law in that it does not show that said defendants were dealers in coal or in anthracite coal, or otherwise had any power to regulate and fix the price thereof or to restrain trade therein?

" 2.    Is said indictment insufficient in law in that it does not show that said defendants conspired to create a monopoly in coal or anthracite coal?

" 3.    Is said indictment insufficient in law in that it does not appear in and by the same that said defendants conspired to raise the price of coal or to fix a price that was unlawful, exorbitant, unwarranted or oppressive?

" 4.    Is said indictment insufficient in law in that it does not appear in and by the same that said alleged agreement to fix and regulate the price of coal was for any appreciable point of time or was an agreement binding on any of the parties thereto?

" 5.    Does an' agreement or combination to fix and regulate the price of coal as the same is set forth in the indictment constitute a criminal offence?

" 6.    Is said indictment insufficient in law in that it does not properly or sufficiently set forth either the means or the purpose of the alleged combination or agreement?

" 7.    Is said indictment insufficient in law in that it does not set forth the alleged agreement or combination with sufficient precision?

"8.  Can a corporation be guilty of the crime of conspiracy?"

To answer the questions it is necessary to consider whether the crime of conspiracy is properly charged in the indictment. We have already defined criminal conspiracy to be a "confederation to do something unlawful either as a means or an end," *State* v. *Bacon*, 27 R. I. 252, 257.  Is anything *unlawful* charged, either as a means or an end?  No unlawful means are alleged in any of the counts.  Therefore it must appear that something unlawful is charged against the defendants as an end.  The object to be effected, as hereinbefore stated, according to the first count, is: "unlawfully to regulate and fix the price at which coal should be sold in the City of Providence, to the prejudice of the public."  Under the second count it is "to then and there, in restraint of trade and to the injury of the public trade, unlawfully create, enter into, and become members of and parties to a trust, agreement, combination, confederation and understanding, with each other wrongfully and unlawfully to regulate and fix the price at which coal should be sold in the City of Providence, which coal was then and there an article of prime necessity to the public and consumers thereof."

By the third count it is "to do an illegal act injurious to the public trade, to wit, to then and there unlawfully regulate and fix the price at which anthracite coal should be sold in the City of Providence and that they did fix and regulate the price of anthracite coal in the City of Providence."  The object to be effected according to the fourth count is "to do an illegal act injurious to the public trade, to wit, to then and there unlawfully fix the price at which coal should be sold in the City of Providence."  The question may therefore be narrowed down to this: Is it unlawful for one person to fix the price at which coal shall be sold within the limits of a city?  If it is, then it is necessarily a criminal offence for several persons to combine for that purpose.  But if it is lawful for one, then it does not become unlawful merely because a number are engaged with him in doing it.  This doctrine is announced in *Macauley Brothers* v. *Tierney*, 19 R. I. 255 (1895), wherein Matteson, C. J., speaking for the court, says (p. 264): "What a person may lawfully do a number of persons may unite with him in doing

without rendering themselves liable to the charge of conspiracy, provided the means employed be not unlawful."

Portions of the opinion of Ball, J., in *Chicago, &c. Coal Co.* v. *The People,* 114 Ill. App. 75 (1904), may seem to be in conflict with this doctrine, for on page 111 he reasons: "Counsel for defendants say that any one may lawfully fix the price at which he will sell his product, or he may lawfully refuse to sell it at any price. This is true. The injury to the public, if any, from the acts of an individual are infinitesimal; and in the long run they correct themselves. Hence the law places few restrictions upon a man in the management of his own affairs. But 'men can often do by the combination of many, what severally no one could accomplish, and even what when done by one would be innocent.' Morris Run v. Barclay, 68 Pa. St. 173. Whenever the act to be done by such a combination necessarily tends to prejudice the public or to oppress individuals, the combination has always been held to be criminal."

" 'There is potency in numbers when combined, which the law cannot overlook where injury is the consequence.' Morris Run v. Barclay, supra."

It is worthy of note that the case then being considered was tried upon an agreed statement of facts and law from which the judge was able to ascertain the consequences that naturally would flow from the agreement, and that the case of *Morris Run* v. *Barclay* was heard upon the report of a referee who found that the contract was void by statute and at common law, as against public policy, and that the contracting corporations represented almost the entire body of bituminous coal in the northern part of the State; that by combination between themselves they had the power to control the whole market in the district; and that they did control it by a contract not to ship and sell coal otherwise than as therein provided; and that in order to destroy competition they provided for an arrangement with dealers and shippers of anthracite coal. All this information was not gained from an inspection of the pleadings. As was well said by Agnew, J., in *Morris* v. *Barclay, supra,* at p. 187: "If the motives of the confederates be to oppress, the means they use unlawful, or the consequences to

others injurious, their confederation will become a conspiracy. Instances are given in *The Commonwealth* v. *Carlisle, Brightly's*, R. 40.   Among those mentioned as criminal is a combination of employers to depress the wages of journeymen below what they would be, if there were no resort to artificial means; and a combination of the bakers of a town to hold up the article of bread, and by means of the scarcity thus produced to extort an exhorbitant price for it.   The latter instance is precisely parallel with the present case.   It is the effect of the act upon the public which gives that case and this its evil aspect as the result of confederation; for any baker might choose to hold up his own bread, or coal operator his coal, rather than to sell at ruling prices; but when he destroys competition by a combination with others, the public can buy of no one."

In *People* v. *Sheldon, et al.*, 139 N. Y. 251 (1893), the court found (p. 262): "A combination between *independent* dealers, to prevent competition between themselves in the sale of an article of prime necessity, is, in the contemplation of the law, an act inimical to trade or commerce, whatever may be done under and in pursuance of it, and although the object of the combination is merely the due protection of the parties to it against ruinous rivalry, and no attempt is made to charge undue or excessive prices."   The court added (p. 263): "The question is, was the agreement, in view of what might have been done under it and the fact that it was an agreement the effect of which was to prevent competition among the coal dealers, one upon which the law affixes the brand of condemnation.   It has hitherto been an accepted maxim in political economy that 'competition is the life of trade.'   The courts have acted upon and adopted this maxim in passing upon the validity of agreements, the design of which was to prevent competition in trade, and have held such agreements to be invalid."

Though the language of these opinions does not lay stress upon this fact, it appears that the objects of the combinations criticised, if they could have been attained by individuals, would have been unlawful; hence, the combination to secure these objects was criminal.

In the cases at bar our knowledge of the facts is derived

from the allegations in the several counts in the indictments. Is it an inevitable consequence of the conduct charged against the defendants that public trade will be restrained or injured or that the public will be injuriously affected thereby?

To return to the question: Can a person, natural or artificial, lawfully control and fix the price at which coal shall be sold within the limits of the city of Providence? If so, then a number of persons can lawfully combine for that purpose. But if not, then it becomes a crime to confederate for the purpose of accomplishing such unlawful act. No person can *control, regulate,* or *fix* the price at which an article shall be sold without having complete dominion and control of the article itself. To enable a person to fix and control the price he must be free from competition. In other words, he must have obtained a monopoly of the article.

"It is said to be a monopoly when *one person alone* buys up the whole of one kind of commodity, fixing a price at his own pleasure." Black Law Dict.

The constitution of Maryland, North Carolina, and Tennessee declare that "Monopolies are contrary to the genius of a free government, and ought not to be allowed." In the Roman law persons who monopolized grain and other produce of the earth were called *dardanarii,* and were variously punished. Dig. 47, 11, 6. It was a crime at common law to buy up such large quantities of an article as to obtain a monopoly of it for the purpose of selling at an unreasonable price. The tendency of modern English law is very decidedly to restrict the application of the law against engrossing, and it is very doubtful if it applies at all except to obtaining a monopoly of provisions. Bouv. Law Dict. There can be no doubt but that coal is an article of prime necessity in this part of the country, and therefore legally capable of being engrossed. Doubtless engrossing is an offence at common law in this State.

It is provided in General Laws cap. 284, § 1: "Every act and omission which is an offence at common law, and for which no punishment is prescribed by this title, may be prosecuted and punished as an offence at common law." The same pro-

vision is contained in Pub. Stats. cap. 247, § 1; Gen. Stats. cap. 235, § 1; and Rev. Stats. cap. 219, § 1.

In Pub. Stats. 1844, by section 6 of the act establishing the Digest, it was provided: When no provision is made either at common law or by the Revised Statutes, such statutes as were introduced before the Declaration of Independence and as have been continued in force shall be considered as part of the common law, and remain in force until the general assembly provide therefor.

The provisions of section 59 of "An act to reform the penal laws," contained in the Digest of 1822, are identical with those in the Digest of 1798, section 55 of "An act to reform the penal laws," which reads as follows: "And be it further enacted, That any crime or offence, being such at the common law, and for which no punishment is prescribed by this act, shall and may be prosecuted and tried, adjudged and punished, by fine or imprisonment, or both, as an offence at the common law, anything in this act to the contrary notwithstanding."

The Digest of 1767 (pp. 55 and 56) contains the following "Act, regulating sundry Proceedings in the several Courts in this Colony.

"Be it Enacted by the General Assembly, and by the Authority thereof it is Enacted That all the Courts in this Colony shall be held to, and governed by, the Statutes, Laws, and Ordinances of this Colony, and such Statutes of Parliament as are herein after mentioned, that is to say:"    . . . .

"All Statutes, that are against criminal offenders, so far as they are descriptive of the Crime, and where the Law of this Colony hath not described and enjoined the Punishment, then that Part of the Statute that relates to the Punishment also; always saving and excepting such Statutes as, from the Nature of the Offences mentioned in them, are confined to *Great-Britain* only."    . . .

"And be it further Enacted by the Authority aforesaid, That in all Actions, Causes, Matters and Things, whatsoever, where there is no particular Law of this Colony, or Act of Parliament introduced, for the Decision and Determination of

the same, then and in such Cases, the Laws of *England* shall be in force for the Decision and Determination of the same."

As was said by Brayton, J., in *Martin* v. *Clarke, et als.;* 8 R. I. 389 (1866), at p. 403, referring to another offence, "suppose, however, that champerty were not an offence at the common law, and were first made illegal by the Statute of Westminster I., the answer to the question, if it be now an offence here, must still be the same. If there had been no legislation here upon the subject, the colonists here, upon their emigration, brought with them, to this country, the law of England as it then existed, as modified by statutes, so far as it was applicable to their condition and circumstances here, and this statute, as part of that law, became a part of the common law of this country."

Although the list of common-law offences in this State may be said to include that of engrossing, our history does not disclose any prosecutions made thereunder; it may therefore be considered as dormant, but ready to be called into activity whenever the occasion may require. When it becomes necessary, the law relative to engrossing in this State will be applied with due regard to the circumstances and conditions existing at the time of its enforcement. The danger to be apprehended from engrossing is monopoly.

A monopoly, as now understood, "embraces any combination the tendency of which is to prevent competition in its broad and general sense and to control prices to the detriment of the public." 20 Ency. of Law, 846.

This subject was considered by the court in *Oakdale Mfg. Co.* v. *Garst,* 18 R. I. 484 (1894), wherein Stiness, J., speaking for the court, said, at p. 487:

"Undoubtedly there may be combinations so destructive of the right of the people to buy and sell and to pursue their business freely that they must be declared to be void upon the ground of public policy. In such cases the injury to the public is the controlling consideration. But it does not follow that every combination in trade, even though such combination may have the effect to diminish the number of competitors in business, is therefore illegal. Such a rule would produce

greater public injury than that which it would seek to cure. It would be impracticable. It would forbid partnerships and sales by those engaged in a common business. It would cut off consolidations to secure the advantages of united capital and economy of administration. It would prevent all restrictions and exclusive privileges, and hamper the familiar conduct of commerce in many ways. There may be many such arrangements which will be beneficial to the parties and not injurious to the public. Monopolies are liable to be oppressive, and hence are deemed to be hostile to the public good. But combinations for mutual advantage which do not amount to a monopoly, but leave the field of competition open to others, are neither within the reason nor the operation of the rule."

It is a criminal offence for a person to obtain a monopoly of a prime necessity of life. It is no answer to say that the article may have been monopolized for a benevolent purpose. It is the stock excuse of monopolists that their work is beneficent and charitable. It is not safe to allow monopolies of prime necessities of life to exist for any purpose. They are "contrary to the genius of a free government."

In order to regulate and fix the price of an article it is absolutely necessary to have or to acquire the power so to do.

In the case of *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, 236, Mr. Justice Peckham makes use of the following expressions: "Much evidence is adduced upon affidavit to prove that defendants had no power arbitrarily to fix prices and that they were always obliged to meet competition. To the extent that they could not impose prices on the public in excess of the cost price of pipe with freight from the Atlantic seaboard added, this is true, but within that limit they could fix prices as they chose. The most cogent evidence that they had this power is the fact everywhere apparent in the record that they exercised it. The details of the way in which it was maintained are somewhat obscured by the manner in which the proof was adduced in the court below upon affidavits solely, and without the clarifying effect of cross-examination, but quite enough appears to leave no doubt of the ultimate fact. .

" 'The defendants were by their combination, therefore, able to deprive the public in a large territory of the advantages otherwise accruing to them from the proximity of defendants' pipe factories and, by keeping prices just low enough to prevent competition by Eastern manufacturers, to compel the public to pay an increase over what the price would have been if fixed by competition between defendants, nearly equal to the advantage in freight rates enjoyed by defendants over Eastern competitors. The defendants acquired this power by voluntarily agreeing to sell only at prices fixed by their committee and by allowing the highest bidder at the secret "auction pool" to become the lowest bidder of them at the public letting. Now, the restraint thus imposed on themselves was only partial. It did not cover the United States. There was not a complete monopoly. It was tempered by the fear of competition and it affected only a part of the price. But this certainly does not take the contract of association out of the annulling effect of the rule against monopolies. In *United States* v. *E. C. Knight Company,* 156 U. S. 1, 16, Chief Justice Fuller, in speaking for the court, said : " Again all the authorities agree that in order to vitiate a contract or combination, it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition.' " "

A charge of conspiracy that the defendants combined to exercise a certain power must proceed upon the assumption that they have or will have the power to be exercised. Therefore a charge of conspiracy to exercise a certain power presupposes the acquisition of the power. The gravamen of the offence, however, consists in combining to acquire the power; whether it shall be exercised or not depends entirely upon the will of those who control it. The danger to be guarded against is possession of the power, and efforts to obtain it should be prevented. " Prosecutions for conspiracy are preventive rather than curative," *State* v. *Bacon,* 27 R. I. 252, 261. Conspiracies to exercise power without possessing it must be futile, as if the courtiers of King Canute had conspired to regulate the ocean tide.

The charge in each indictment is not that the defendants conspired to create a monopoly in order to regulate and fix the price of coal. The charge is that the defendants combined to do something that can only be done through a monopoly. The act of fixing the price is only an attribute of a monopoly, an *indicium* by which it may be classified. It is a symptom, but it is not the disease itself. It may be argued that because the defendants are charged with conspiring to do that which only monopolists can do, that therefore they are charged with conspiracy to create a monopoly itself. The very fact that it requires argument to complete the pleading shows wherein it is defective. Criminal pleading must be clear and definite.

"In indictments and informations every fact necessary to constitute the crime charged must be directly and positively alleged. Nothing can be charged by implication or intendment, nor is it sufficient to charge any material matter by way of argument." 22 Cyc. 293, C.

We are of the opinion that each count in both indictments is defective in this: it charges, by implication, intendment, and inference, that the defendants conspired to create a monopoly in coal in the city of Providence. Having arrived at this conclusion, we answer the questions propounded to us, as follows:

The first, second, sixth, and seventh questions we answer in the affirmative. The third and fifth questions we answer in the negative. To the fourth question we answer: If the offence was set out with proper particularity in other respects, we should regard this objection as unimportant, as the duration of the illegal contract is not of the essence of the crime.

The eighth question raises the inquiry: Has a corporation the ability to commit this kind of crime?

The defendants, in support of their contention that it has not, argue as follows: "We submit that, on principle and authority, a corporation has not, from its very nature, the capacity to commit this offense. It is too plain to require argument that this intangible entity can not actually do any act requiring any mental, moral, or spiritual process, or any act, as it is more frequently put, requiring intent. In civil

cases the intent of the officer or agent is sometimes imputed to the corporation, it is true, but this doctrine is admittedly a pure legal fiction, based on grounds of public policy.

"In civil cases a party has been injured and is seeking compensation. Balancing the equities of the plaintiff and the stockholders of the defendant corporation, it has seemed more just that the person injured should be reimbursed than that an individual stockholder should be absolved from liability forced upon him by an officer of the corporation. But in criminal cases the theory is adequate punishment for an offense against the State. The punishment may be out of all proportion to the benefit gained by the commission of the crime, and never has any logical relation to it. Oftentimes no advantage is gained by the corporation, so that to punish an innocent stockholder for an offence really committed by an officer of the corporation can have no basis in justice. Furthermore, all the benefit of the preventive objects of the punishment can be accomplished by punishing those who are in fact the wrongdoers."

The following argument in behalf of the affirmative of the question is presented by the attorney-general:

"Conspiracy is a misdemeanor at common law, and not a felony. There is nothing peculiar connected with the element of intent involved in the crime of conspiracy which differs from the element of intent in other ordinary misdemeanors. If the contention of the defendants is held to be good it would seem to necessarily follow that a corporation could not be held guilty of any of the ordinary crimes where the question of intent was involved. In the early history of corporations they were held to be without power of action except through their agents, and therefore they could not be guilty of a crime requiring a criminal intent. It is believed that this theory has long since been exploded both in England and America. At the present time there seems to be very little doubt that corporations may be guilty of most of the common crimes, and that criminal intent will be imputed to the corporation from acts done by its agents. It is still held in some jurisdictions that corporations can not be guilty of a felony, or crimes where

personal violence is involved, but that is as far as any courts, it is believed, will now go in holding that they can not be guilty of crime. The tendency of the present time is to hold corporations responsible, criminally as well as civilly, for all acts committed by their agents, having any relation to the business of the corporation.

"It has been repeatedly held that a corporation may be guilty of criminal libel, of maintaining the various kinds of nuisances, and of violations of the various obligations which it owes to the public. Some States even hold them capable of committing the crime of assault and battery and other similar crimes.

"It is now universally held that corporations may be liable for all kinds of torts, including conspiracy. It is further generally held that a corporation is liable in exemplary or punitative damages, damages which from their very nature are only allowed as punishment for an actual wrong committed, which the law presupposes that the defendant had the volition or initiatory power to commit or not to commit. The intention of the officers and agents of the corporation is imputed to the corporation in these civil cases, but that is what is done in all other cases where a corporation is held criminally liable. Corporations are held amenable for acts of conspiracy in the enforcement of contracts in civil law. Why should there be a distinction in the law with regard to conspiracy between that which is criminal and that which is civil?"

In support of their argument, the defendants also quote 2 Morawetz on Corporations, 2d ed. § 732: "It is sometimes said that the act of an agent is, in law, the act of his principal; but it is well to bear in mind that this is a mere fiction. A principal is frequently liable for the acts of his agents, as if he had done the acts himself; the reason of the liability, however, is not always the same. Sometimes the principal is chargeable by reason of his previous consent, sometimes by reason of his subsequent adoption of the act of the agent, and sometimes by reason of a rule of positive law established upon the grounds of public policy, which is the ultimate source of all law. It is for the latter reason that a principal may often be

held civilly responsible for the torts of his agents, though in no manner at fault himself; and this is true, even where the tort involves a malicious intention on the part of the wrong-doer.

"But public policy certainly does not demand that a person or association should be punished by the State, through criminal proceedings, on account of a wrong committed by another. This would be contrary to the natural sense of justice. Hence it is held that where the commission of a crime involves the intention of the offender, this intention cannot be imputed by means of a fiction; actual intention is required.

"It follows, therefore, that a corporation cannot be charged criminally with a crime involving malice, or the intention of the offender. Even though the corporators themselves should unanimously join, with malice aforethought, in committing a crime as a corporate act, yet the malice would be that of the several members of the company, and not actually one malicious intention of the whole company."

This doctrine, however, is contrary to that held in *The Buffalo Lubricating Oil Company* v. *The Standard Oil Company of New York*, 106 N. Y. 669 (1887): "We entertain no doubt that an action against a corporation may be maintained to recover damages caused by conspiracy. (*Morton* v. *Metropolitan Life Ins Co.*, 34 Hun. 366; affirmed, 103 N. Y. 645; *Reed* v. *Home Savings Bank*, 130 Mass. 443; *Krulevitz* v. *Eastern R. R. Co.*, 140 Mass. 575; *Western News Co.* v. *Wilmarth*, 33 Kan. 510.) If actions can be maintained against corporations for malicious prosecution, libel, assault and battery and other torts, we can perceive no reason for holding that actions may not be maintained against them for conspiracy. It is well settled by the authorities cited, that the malice and wicked intent needful to sustain such actions may be imputed to corporations."

If corporations have the capacity to engage in actionable conspiracy they have the power to criminally conspire. We are of the opinion that the better reasoning supports the contention that corporations can conspire, and therefore answer the eighth question in the affirmative.

Having thus fully decided the questions certified to us in

the cases at bar, we send back the papers in each cause, with our decision certified thereon, to the Superior Court for the counties of Providence and Bristol, for further proceedings.

*William B. Greenough*, Attorney-General, and *James C. Collins, Jr.*, special counsel, for State.

*Dexter B. Potter*, for Curran & Burton, Inc., and for Smith P. Burton.

*Henry W. Hayes*, for John R. White & Son, Inc., and for James A. Kinghorn and Merwin White.

*Frank L. Hinckley*, for Eastern Coal Co. and George E. Warren.

*Arthur M. Allen*, for Doe & Little Co. and Harry C. Clark.