**UNITED STATES v. PULLMAN CO. et al.**

Civil Action No. 994.

District Court, E. D. Pennsylvania.

April 20, 1943.

Robert H. Jackson, Atty. Gen., Thurman Arnold, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., Fowler Hamilton, Frank Coleman, Wm. L. McGovern, and Wilber Stammler, Sp. Assts. to Atty. Gen., and Joseph McDowell and Paul Fitting, Sp. Attys., both of Washington, D. C., for plaintiff.

Ralph M. Shaw, of Chicago, Ill., George Wharton Pepper, of Philadelphia, Pa., Seth W. Richardson, of Washington, D. C., Walter H. Jacobs, Lowell M. Greenlaw, and Guy A. Gladson, all of Chicago, Ill., Adrien F. Busick, of Washington, D. C., Winston, Strawn & Shaw, of Chicago, Ill., Davies, Richberg, Beebe, Busick & Richardson of Washington, D. C., and Pepper, Bodine, Stokes & Schoch, of Philadelphia, Pa., for defendants.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges, sitting pursuant to the Expediting Act, Act of Feb. 11, 1903, as amended, 36 Stat. 854, 1167, 15 U.S.C. A. § 28.

GOODRICH, Circuit Judge.

This is a proceeding brought by the United States to restrain alleged violations of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act.[1] The principal corporate defendants are the Pullman

---

[1] "Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * * Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 26 Stat. 209, as amended, 50 Stat. 693, 15 U.S.C.A. § 1.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one

Company, the Pullman-Standard Car Manufacturing Company and Pullman, Inc. A description of the corporate defendants and the relation of the individual defendants therewith are found in the stipulation of facts entered into between the parties, found as facts by the Court. They need not be repeated here.

The Pullman Company is today, and has been since 1900, except for railroads which have performed their own sleeping car service, the only person or company in the United States engaged in the business of furnishing sleeping car service to the railroads of the United States. Plaintiff does not contend that the mere fact that one engages in an interstate commerce business in which he has no competitors makes him a violator of the Sherman Act. It contends rather that Pullman is the sole entrepreneur because of the successful completion of a plan formed in the early days of the company's history to eliminate its competitors and its successful arrangement of affairs with contracting railroads to the end that no one else can now get into a position to compete either in manufacturing, furnishing or operating of sleeping cars.

George M. Pullman was the founder of the business which still bears his name. That name has become synonymous with sleeping car transportation in the United States. In 1858 Mr. Pullman arranged with a predecessor of the Alton Railroad to remodel two of its day coaches into sleepers. In 1863 he and Benjamin Field constructed an entirely new sleeping car, the famous "Pioneer", the success of which laid the foundation for the general introduction of sleeping car transportation in America. The Pullman business was incorporated as Pullman's Palace Car Company in 1867.

It serves no useful purpose to detail in this opinion the facts concerning the development of the sleeping car business from 1858 to 1900 already appearing in the findings of fact made by the Court upon the testimony and exhibits or settled by stipulation of the parties. Numerous companies and individuals entered the field. Varying types of arrangements were made between sleeping car companies, including Pullman, and the railroads. Sometimes the furnishing of sleeping car service was a joint affair with the railroad and the sleeping car company both participating. Sometimes it was an out and out contract to provide a service in sleeping cars. Our findings of fact state that there was competition to some extent between sleeping car companies for the business of the traveling public at one time. While the Wagner Palace Car Company's sleeping cars were used on what are now known as the New York Central lines and the Pullman Company's sleepers were used on the Pennsylvania lines, obviously the passenger from New York to Chicago had his choice of competing sleeping car services.

More important was the competition, or possibility of competition, among sleeping car companies for the business of supplying the various railroads with sleeping cars and sleeping car service. There was such competition. Officers of the Pullman Company stated this as a fact before the Interstate Commerce Commission. Pullman at one time or another lost the business of the Central Vermont, the Chicago & Northwestern, the Chicago, St. Paul, Minneapolis & Omaha, the Missouri, Kansas & Texas, the Michigan Central and the New York, Ontario & Western to Wagner. At other times it had lost its business on the Richmond & Danville and on a portion of the Central Railroad of New Jersey to the Union, Mann and Woodruff companies. It is true that not all of the various sleeping car companies competed with each other for the business of all the railroads.

year, or by both said punishments, in the discretion of the court." 26 Stat. 209, 15 U.S.C.A. § 2.

"Sec. 3. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 731, 15 U.S.C.A. § 14.

In some instances, their operations were non-competitive, one's operation beginning at the geographical point where the other's service ceased. But there was some competition and always the possibility of more, depending upon the aggressiveness of the management of the various companies, where several sought the sleeping car business of the railroads.

At an adjourned special meeting of the stockholders of Pullman held on January 31, 1870, the following entry, inter alia, appears in the minutes of the meeting: *"Whereas,*—It appears to the Stockholders, upon full consideration of the subject, that the importance and value of the Business conducted by this Company very largely depends upon forming continuous lines of Sleeping Car communication, and also upon the absorption of Sleeping Car facilities upon as many Trunk Lines of Railway as possible thereby preventing useless competition;—"

Again, on April 3, 1873, at a meeting ratifying the acquisition of control of the Erie and Atlantic Sleeping Coach Company, the minutes state: "Whereas—It is deemed expedient to embrace in our system as far as practicable all the through lines between Chicago and New York, * * *."

█ The plaintiff stresses the importance of these recitals; the defendants minimize them. We think they are competent evidence to show defendants' state of mind at the time. The time, of course, was a good while ago, long before the Sherman Act. But if such declarations point in the direction of a path which has been followed continuously since their adoption, it is not unfair to take them as the initiation of a consistent Pullman policy. Standard Oil Company of New Jersey v. United States, 1911, 221 U.S. 1, 46, 47, 75, 76, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; United States v. Reading Company, 1920, 253 U.S. 26, 43–45, 40 S.Ct. 425, 64 L.Ed. 760.

Between 1867 and 1900 the Pullman Company acquired every other sleeping car concern in the United States which had not theretofore gone out of business or had not been acquired by other companies subsequently absorbed by the Pullman Company or by the Wagner Palace Car Company. The last purchase was that of the Wagner Palace Car Company which was acquired in 1899. This was the only acquisition which was shown to have occurred after the passage of the Sherman Act. We heard a great deal in the evidence concerning the surrounding circumstances of these acquisitions and especially that relating to the Wagner Company. Defendants point out, and the plaintiff concedes, that in no case was the acquisition by Pullman the result of predatory practices such as misrepresentation, temporary price cutting to kill a competitor, or the like. Pullman further says that the price paid in each instance was reasonable and that the overtures which resulted in the acquisition were made by the seller and not Pullman as buyer. Plaintiff disputes the reasonableness of the price paid in some instances, especially in the cases of Central Transportation Company and the Wagner Company.

We do not think that the issue whether defendants have violated the Sherman Act turns upon who initiated negotiations for purchase or whether the price paid by Pullman was high or low. Pullman did buy and whatever the price paid was, it was not too much from Pullman's point of view for it built the units secured into an integrated and successfully operated whole. Competitors were all absorbed.[2]

█ If this were all we had in the case we should face the difficult question whether a violation of the Sherman Act is involved where a business enterprise, admittedly engaging in interstate commerce, has acquired the sole possession of the field by absorption, in non-predatory fashion, of all of its competitors. Defendants say that to answer this question in the affirmative is to maintain that one in business competition may do everything except suc-

---

[2] Some of the railroads of the country operated all or part of the sleeping car business on their lines themselves. They have gradually disassociated themselves from this business. At the time this suit was instituted only a few railroads in the United States were operating any part of their sleeping car service. Perhaps the most important exception is the Canadian Pacific Railway Company, which has some Pullman service but also operates its own sleeping cars. Some of the cars of the Canadian Pacific go to points within the United States. The Stipulation of Facts of the parties gives some of the details of this operation for individual roads.

ceed. The plaintiff's position on the point is categorically taken with an affirmative answer to the question. It says that mere possession of exclusive control over a commodity or service constitutes monopolization; a fortiori there is monopolization when such power is obtained by acquisition of competitors. For this conclusion it cites Standard Oil Company of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; United States of America v. American Tobacco Company, 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L. Ed. 663; United States v. Reading Company, 1920, 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; United States v. Great Lakes Towing Co., D.C.N.D.Ohio, 1913, 208 F. 733. However, the Court does not feel compelled to rest the decision of this case on the fact of a company acquiring all its competitors by purchase, the last acquisition being forty-three years ago. While the doctrine of laches does not apply against the United States[3] we should approach the question of equitable relief with great hesitancy in a case where the last operative fact was nearly half a century old.

The plaintiff's case, however, is not presented in such a closed volume. The contention is that not only did the Pullman Company engross the market through the acquisition of all competitors, but that it has maintained itself since as the sole proprietor of the business of furnishing sleeping car service by devices which have continued and entrenched its exclusive position. Further, it is urged, the business practices of the defendants right up to the time of this law suit are such that only an organization with complete monopolization of the market which it serves could follow them. Such a domination, declares the plaintiff, is the clearest possible example of the practice which the Sherman Act was designed to prevent.

Do the facts show that the defendants are not only the sole proprietors in the sleeping car business, but that their control is such that no one else can enter it? It is not that the Pullman Company or its manufacturing associate, Pullman-Standard, have any exclusive legal rights in the manufacture of sleeping cars. The parties stipulate that there are no basic patents standing in the way and that there are several manufacturers in the country ready, able and willing to make sleeping cars if called upon to do so. Nor has the Pullman Company any legal standing to operate sleeping cars on railroad lines without permission of the railroad. In its relation with the traveling public, Pullman is subject to regulation by the Interstate Commerce Commission; its relations with its railroad customers are a matter of contract. And the business about which this suit centers is not that of furnishing sleeping cars to the public, but that of supplying such cars and the service incident to their operation to the railroads of the country. It is in this business that the government contends that the defendants have violated the Sherman Act.

The next step is, then, to examine the evidence bearing upon how the defendants, sole operators in the sleeping car business since 1900, are alleged to have so fortified their position as to repel all possible attempts at competition. The alleged means are various.

*The exclusive dealing feature.* A standard provision appearing in most of the contracts offered in evidence, is that Pullman shall have the exclusive right to furnish all the sleeping cars to the railroads. In some contracts, particularly the recent ones, Pullman is expressly given the exclusive right to furnish "the usual service" in such cars. However, it is clear that it has that right under all these contracts. In the early days of the sleeping car business, this was not always so; contracts were made by Pullman for service on a segment of some railroad's lines where another sleeping car company had a similar contract for service on some other portion. Even now there remain a few instances where railroads continue to furnish their own sleeping car service upon some of their lines. The Canadian Pacific, which runs into United States territory, has a Pullman contract for part only of its sleeping car service. But, with only minor exceptions the country-wide network of sleeping car service is supplied by Pullman Company cars and service and the contracts provide for exclusive Pullman service in the furnishing and operating of sleeping cars.

These facts, in the large not a subject of dispute, have significance in the whole legal picture, though we do not need to

---

[3] Utah Power & Light Company v. United States, 1917, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791.

draw any conclusion from them alone. No doubt the sole laundry in a town may agree to devote all of its facilities to the service of the local hotel for a year, and the hotel proprietor agree to deal exclusively with that laundry for the contract period. A monopolization and a restraint of trade are involved. In the ordinary case, they are too slight to invoke legal consequences. But when the one rendering the service makes an exclusive service contract with the many others in the whole nation who have need of such services, the question is certainly different and the answer may conceivably be so too. Admittedly the difference is one of degree but we all understand by now that it is none the worse for that. But no conclusion need be drawn until we look at all the figures in the picture.

*Service from Pullman's cars only.* That it is Pullman's policy and practice to furnish sleeping car service only with cars owned by it is undisputed. "The Pullman Company has never held itself out to perform service in sleeping cars owned by others and is not and never has been engaged in such business * * *. The Pullman Company has stated upon inquiries from railroads that its responsibilities in the performance of its sleeping and parlor car services will be discharged only with equipment and organization of its own choice."[4] In other words, the position of the Pullman Company is that if a railroad wishes to avail itself of Pullman sleeping car service, it may have it with such cars as Pullman chooses to provide. That choice is the cars owned by Pullman and for the most part either manufactured by it or its associate Pullman-Standard. "Since 1900, either Pullman Company or Standard has manufactured all new sleeping cars acquired by Pullman Company."[5] Some used cars have been acquired by it in taking over sleeping car service on railroads which formerly furnished their own service with their own cars.

There have been a few exceptions to this practice. The Denver & Rio Grande Western has four specially built cars, two of which are sleepers and buffet lounges which are railroad owned and Pullman serviced.[6] The Santa Fe and the Burlington each bought some lightweight sleeping cars which, after considerable discussion, were finally leased to Pullman and operated by it on the respective lines. This incident will be mentioned later. Despite minor exceptions, the general policy of Pullman is perfectly clear and has been consistently maintained. Pullman sleeping car service is to be had in Pullman owned sleeping cars only and Pullman is to make the choice of what kind of cars they are to be and where they are to be obtained.

Defendants say that this is but an instance of a contractor employed upon another's premises stipulating for the use of his own tools in doing the work. Here again, we must guard against a generalization which concludes that because an arrangement is legal for one degree, it is equally so for the whole three hundred sixty. The problem as to the exclusive furnishing of cars is not essentially different from that of exclusive dealing with the supplier described above. We are dealing here not with one contractor and one landowner but a contractor who has an arrangement to supply its own choice of sleeping cars to every railroad in the United States. That Pullman in fact controls the furnishing and servicing of sleeping cars is clear, whatever the legal consequence of such control may be. Here again, as with the exclusive dealing arrangement, consideration of the problem of law presented may be deferred until the picture is filled in.

*Timing of contracts.* Two points were developed in this connection:

One has to do with the term for which Pullman railroad contracts are drawn. The fact is settled by stipulation. Between 1890 and 1920 the term of most of the contracts was from 15 to 25 years. Between 1920 and 1932 the term of most of such contracts was 15 years, and since 1932 the term of most of such contracts has been five years. It is not covered by the stipulation but we think it clear that the reason for the short term contracts since 1932 was Pullman's fear of finding itself obligated under a long term contract in the face of rising costs and decreasing business.[7]

4 Stipulation of Facts, page 79.

5 Id., paragraph 103.

6 The Denver & Rio Grande Western also owns two sleepers which it purchased from Pullman and rearranged and reequipped. These are operated and serviced by the Denver & Salt Lake, which is owned by the Denver & Rio Grande Western.

7 This was anticipated by the Pullman officials, as early as August 14, 1929. The minutes of the Executive Committee

As a competition killer the long term contract is an effective weapon. One could hardly have a more favored service contract than an agreement for exclusive dealing, equipment of one's own choosing and a quarter century of time to elapse before one need to be concerned with new terms. Even a patentee is not so secure against the passage of time. Multiply the advantage by the number of railroads with whom Pullman secured service contracts and its position, for the years covered, was impregnable.

The security in long time contracts has been buttressed further by staggered expiration dates. No evidence was shown us that Pullman officers and directors discussed the subject and determined upon a policy of arranging railroad service contracts so that they would expire at dates well separated from each other. The advantage in bargaining position of Pullman if it could deal with one railroad at a time is too obvious, however, to require discussion either in corporate board meeting or court decision. There is nothing new in the adage: Divide and Conquer. In any event, the contracts through the years did end at different times for different roads, with advantage to Pullman's bargaining position. When Pullman was faced, for one reason or another with joint or simultaneous negotiation with a group of roads, it experienced additional difficulties and inter-office correspondence among its officers speaks with weariness of the tendency of the roads to "gang with" others in their demands.[8]

---

meeting held on that date, read, inter alia: "With the apparent uncertainty regarding the future trend of our operating expenses, Mr. Carry approved a 10-year term in the recent renewals of the Union pacific—Southern Pacific contracts in lieu of the old basis of a 15 or 20-year term, and the management has followed this precedent in preparing the form of contract that has now been submitted to the Rock Island."

　　　*　　*　　*

"After considerable discussion of contract bases in general, it was the concensus of opinion of the Committee members present that all new operating agreements should be limited to a 5-year term, or if written for a longer period, should carry provision for periodic reconsideration and revision, as the inability to forecast the future trend of economic, financial and traffic conditions render hazardous a continuation of the old practice of committing the Company to operating agreements running for terms of fifteen or twenty years."

[8] Thus it was stated in a letter from Mr. Crawford to J. R. Morron, dated July 10, 1931: "I imagine they will come back at us however, with a proposal to have the expiration date of both contracts set at the same time, instead of spaced six months apart as they were under the old contract. At present we have proposed to the Pennsylvania a 2½ year term running to December 31, 1932, and a 3-year term to the New York Central running to December 31, 1933. With short terms such as are now proposed, there isn't much to be said against a coincident expiration date for these two big contracts, except that we would rather have them separate. With the old New Haven contract also expiring De-

cember 31, 1932, there is quite an evident possibility of group action here but recent experience has shown how the roads can bluff along under a new contract status, if they wish to gang with some other road in Pullman contract negotiation. This question of the policy of making a stand on the question of spreading the expiration dates of these important contracts is one of the things on which I especially want to get your judgment, and I am bothering you with this detail in advance of seeing you next week so you might have opportunity to give some thought to the thing in advance of my talk with you."

Again, in an unsigned letter dated September 26, 1931, to A. O. Choate, apparently written by Mr. Crawford, there appears: "There was some attempt to discuss period of contract in this joint meeting [with the Pennsylvania and New York Central contract committees] but I declined to do so on the definite statement that we were negotiating individual contracts with individual railroads, and when Mr. Ingersoll said something about his contract ending in 1932 I reminded him that that was not the offer that he had on the table. If and when it comes to notifying these two roads of acceptance of the proposed amendment I would propose to make it clear that this amendment has not changed our previous definite offer of a contract period ending December 31, 1932, for the Pennsylvania and December 31, 1931 [1931 changed to 1933 in pencil] for the New York Central. We will probably have a battle on this point before we get through with it, and I think your ideas in favor of a 5-year term may yet be enforced if we want to make a stand on it."

*Feasibility of alternatives open to railroads.* Pullman calls attention to one point very strongly. After all, it tells us, no railroad need use Pullman service unless it wants to do so. Pullman has no legal right to set foot on railroad property without the owner's permission. It is the railroad, not Pullman, which has the public duty to provide passengers on trains a place to sleep. If any railroad does not want Pullman's service in meeting this obligation, the argument continues, it is perfectly free at the expiration of any contract period, to hire someone else to perform the service, or do the job itself, as it pleases.

To this the plaintiff responds that while the argument sounds plausible, no other course but use of Pullman cars and service on such terms as it can get is a practicable one for the railroads. We think that this response is correct in point of fact though the considerations which lead to the conclusion vary among the different roads. The point is important and merits some discussion. The alternative at the present time is not that the railroad may turn to some service company other than Pullman to do the job. There have been no others in the field since Pullman bought out Wagner more than forty years ago. The alternative is, rather, that the railroads either separately or together, run their own sleeping car service.

If a railroad is to do its own sleeping car business it must, of course, have sleeping cars. If new cars are to be furnished they will as a matter of commercial necessity be the lightweight type. Pullman itself has not built or purchased any of the older type heavyweight cars since 1931. New lightweight cars cost, at the beginning of the war, about $80,000 each. It is highly unlikely that they, or new cars of any kind, can be manufactured or purchased during the war emergency. It is possible that if lightweight cars were to be produced after the war in large numbers, the unit price would be considerably reduced. Even at $60,000, to provide an all new lightweight car fleet for any railroad would demand an enormous flow of capital into that industry. The Boston & Maine system, for example, uses in non-peak periods approximately from 54 to 74 cars daily; the Chesapeake & Ohio from 46 to 69; the Missouri, Kansas & Texas from 49 to 55. In the case of larger roads, such as the Pennsylvania and New York Central, the minimum requirements are considerably larger. On the Pennsylvania alone, Pullman has put in operation in the past five years 142 lightweight cars, at an estimated average cost of $80,000 per car, the contract calling for 200 such cars. The situation with respect to the New York Central is similar. The necessary investment at $60,000 per car for non-peak service for the smaller roads mentioned would be:

Boston & Maine Railroad —$3,240,000-$4,440,000

Chesapeake & Ohio Railway Company —$2,760,000-$4,140,000

Missouri, Kansas & Texas Railway Company —$2,940,000-$3,300,000

If used cars are to make up part of a railroad's fleet they can only be purchased from Pullman, for that company owns nearly all that there are. Opportunity to purchase used cars of right was given in some instances only in case Pullman cancelled the contract. Many of the contracts offered in evidence by stipulation contain no provision on the right to purchase. Contracts with the larger railroads, such as the Pennsylvania and New York Central, provide for the purchase of cars upon the expiration of the agreements. Contracts executed after this suit was brought give the railroads the right to purchase upon cancellation, expiration or termination of the contract. However, in cases where the question has arisen, Pullman has never been willing to sell cars to a railroad at their depreciated value, even though such depreciation has been in effect paid by the roads as part of their payment for Pullman service.[9] In no case has the price quoted been less than reproduction cost new less depreciation. It is clear, therefore, that the economic possibility of a railroad at this stage of the matter going into the sleeping car business is a real one only for those roads in a strong financial position. The Pennsylvania says it can do it and doubtless can, though with very great expenditures and the adding of many new employees to its organization. Smaller roads, like the Denver & Rio Grande Western, Seaboard Air Line and Wabash, think that as an abstract financial proposition,

---

[9] A usual provision in Pullman contracts is that Pullman shall first retain from the sale of tickets a sum equal to its "Expenses of Operation" plus an initial return of $1000 per car per annum. "Expenses of Operation" are defined to include, inter alia, depreciation.

they could make it, but consider it impracticable as an economic reality.

Even if a railroad could buy the cars it needed for ordinary day to day use there is still the problem of extra cars for peak loads. All roads have certain periods when the demands increase sharply. But in some, like the Missouri Pacific, Baltimore & Ohio, Southern Pacific and the Pennsylvania, the variation, while perceptible, is comparatively slight throughout the year. Others, like the Florida East Coast, Seaboard, Boston & Maine, Burlington and Northern Pacific have a large amount of seasonal passenger travel in extreme peaks and deep depressions. For instance, the Florida East Coast Railway's requirements may vary from 319 cars in the height of the season to 28 in the dull season. Conversely, those of the Boston & Maine go from a maximum of 173 in summer to a minimum of 54 in winter.[10] The pool of sleeping cars that can be shifted from one road to another as demands vary is called for by sound economic policy. The plaintiff in this suit does not deny this fact and this Court appreciates it fully. It is relevant to be considered in this connection when the practicability of the operation of any railroad's sleeping cars is to be considered.

There are two other factors which bear upon the feasibility of a railroad's alternative to do its own sleeping car business. Through-line sleeping car service is undoubtedly regarded by the public as essential. This is not a consideration for the Pennsylvania in carrying a passenger from New York to Chicago or for the Santa Fe in carrying him from Chicago to the west coast. But a passenger from New York to Miami travels from New York over the Pennsylvania to Washington, the Richmond, Fredericksburg and Potomac to Richmond, the Atlantic Coastline to Jacksonville and the Florida East Coast to his destination. Or if he were going to Miami from Chicago he would ride on the Illinois Central to Memphis, over some leased lines between Memphis and Birmingham, the Central of Georgia, the Atlantic Coastline and the Florida East Coast Railway. We cannot conceive that the traveling public would submit to sleeping car changes each time the traveller left one railroad line and continued his journey on another. Through service is a modern essential, but most railroads cannot, by themselves, provide such through service.

Finally the government points out, and we think with correctness, that the railroads have, at the present time, a financial stake in the Pullman system. They have paid their pro rata share in depreciation on all the Pullman cars. They have paid the Pullman Company's amortization for high-speed betterments on Pullman cars. They are obligated to amortize $20,864,483.33, the agreed installation cost of air conditioning for sleeping cars, of which amount $17,841,054.86 had been paid as of the close of 1940.

We think it clearly demonstrated that measured in terms of economic feasibility most of the railroads of the country could not own and operate their own sleeping cars at the present time as an alternative to Pullman service. To conclude upon this phase of the case: The evidence shows that the Pullman Company by 1900 became the sole proprietor in the field of furnishing sleeping car service to the railroads. This was done both through its own superior aggressiveness and by buying out weaker competitors as and when the opportunity offered. This exclusive position has been maintained by the combination of the various elements just described. There is no other competitor in the field nor is there for most railroads any possible alternative for other sleeping car arrangements except a contract with the Pullman Company on the best terms that can be secured.

In addition to the foregoing, plaintiff's case has been presented to us with evidence on several other subjects having to do with the operation of the defendants and their business dealings with the railroads. The defendants' evidence, in turn, has replied to the points made by the plaintiff. An instance of what is being referred to is the very considerable amount of testimony on both sides on the subject of Pullman's charge for depreciation of sleeping cars

---

[10] The figures are for 1940. The seasonal variations of the two roads were also shown on the basis of the percentage which the revenues accruing in a particular month normally bear to the total of the year. Thus considered in the case of the Florida East Coast Railway, 71.- 5% of its revenues accrues in the months of January to April inclusive; 50.9% of the Boston & Maine's revenues accrues in the four months of June to September. These figures are based on averages of the months from January, 1929, through December, 1940.

as they are used year by year. The government says that the depreciation charge is too high and imposed an additional burden on Pullman's railroad customers who had to pay out to Pullman this amount before they should have been called upon to do so. The result is an increased profit to pullman because it has, in effect, collected money before it was due and had the use thereof although not entitled to it.

Assuming for the moment the preponderance of the evidence by plaintiff upon this point, how does the fact thus proved tend to show that the defendants have violated the Sherman Act? We do not think that over-generous depreciation charges or too high a price charged for air conditioning apparatus are methods of restraining trade or monopolizing it any more than a clothing merchant restrains trade if he charges a customer too much for an overcoat. We do think, however, that showing a group of such practices is relevant while not themselves constituting acts which violate the Sherman Act. They do tend to show that a concern which is able to impose such conditions has a monopolistic control of its market and that whatever concession its customers obtain becomes a matter of grace from the monopolist and not from the pressure of free competition.

The sum total of the instances mentioned bears out the government's position as above interpreted. The various points will be stated very briefly.

Depreciation has already been mentioned. We think that in both depreciation on cars and on air conditioning apparatus, the depreciation rate which the railroads were called upon to pay Pullman was exceedingly high and that Pullman was able to maintain it even as against the opposition of so powerful a customer as the Pennsylvania Railroad.

With regard to repairs, we believe that Pullman in some instances has charged, as repairs to be paid for out of earnings, expenditures upon equipment which were, in essence, capital expenditures extending the service life of the vehicle on which they were made.[11]

We think that imposing 75% of the air conditioning costs upon the railroads showed Pullman to be in a position to dictate terms to its customers which could not have occurred in a competitive market. The same is true with its reluctance to enter or permit its railroad customers to enter, so far as sleeping cars are concerned, the lightweight car field.

We find a further indication of monopolistic control in Pullman's policy with regard to guarantees exacted from its railroad customers. This shows with particular clarity in the case of the railroad lines where the returns at profit-making levels were not uniform. Pullman has successfully insisted on such guarantees from the road as would insure Pullman an operating profit on any cars furnished and this re-

---

[11] A good illustration is the El Monte, a car assigned to the Pennsylvania road. On this car, which was 20 years old and fully depreciated, an expenditure of $19,527.85 was made, of which $18,706.34 was charged to operating expenses and $821.54 to capital accounts. The car prior to the "general repairs" had 10 sections, 1 drawing room, and 2 compartments; afterwards 10 sections and 3 double bedrooms. In an explanation to the Pennsylvania, which had questioned the charge, the repairs were particularized to include "Change of Plan," "Ordinary Classified Repairs," "Steel Plates Renewed," "Upholstery Renewed," "Steel Roof Renewed," "Refinishing Interior," "U. C. B. Brakes," "Lighting Fixtures," "Sash," "Berth Curtains," "Carpet."

A memorandum to Mr. Taylor reveals further cases:

| Car Name | Class | Date Built | | Year Given General Repairs | Cost of General Repairs |
|---|---|---|---|---|---|
| Clan Cameron | Sleeper | June | 1910 | 1932 | $15,629.72 |
| Dimondale | " | Oct. | 1911 | 1931 | 14,224.93 |
| Emerald Hill | " | Feb. | 1913 | 1934 | 23,874.76 |
| Emerald Summit | " | Oct. | 1912 | 1934 | 24,478.03 |
| Villa Clara | " | Dec. | 1911 | 1931 | 17,296.95 |
| Villa Ease | " | Mar. | 1911 | 1931 | 17,128.98 |
| Villa Flora | " | Dec. | 1911 | 1931 | 17,404.17 |
| Villa Martha | " | Nov. | 1911 | 1931 | 17,742.02 |
| Villa Rest | " | Jul. | 1910 | 1931 | 17,710.15 |
| Villa Rosa | " | Dec. | 1911 | 1931 | 17,578.80 |

gardless of the general state of the industry or business in the country.

Relevant also is the fact that the Pullman business enterprises have been and are intimately associated with other large scale businesses of the country, especially railroad transportation, through a number of common directorates. Thus H. S. Vanderbilt and George Whitney, directors of the New York Central, are also directors of the Pullman Company and Pullman, Inc.[12] The association with the Pennsylvania Railroad is through directors D. R. McLennan and R. K. Mellon who are also directors of the two Pullman companies as are J. R. Morron, a director of the Alton and Baltimore & Ohio railroads, and H. S. Sturgis, a director of the Delaware, Lackawanna & Western Railroad Company.[13]

The significance of such interlocking directorates is not that their existence, by themselves, constitutes a violation of the Sherman Act. They did raise problems for Pullman in connection with the Clayton Act and the evidence shows concern manifested by Pullman's officers to find a way that they considered valuable directors could be retained without running afoul of that statute. Aside from this, however, the advantage of having persons of business prominence and influence ultimately associated in the Pullman enterprise, especially when such persons had their connections directly with railroads or with the source of railroad financing is clear. Standing alone it does not constitute a violation of the Sherman Act, but it is significant for consideration as one of the figures in the whole picture through which a complete control of sleeping car transportation was accomplished and is maintained.

Not only does Pullman have exclusive service contracts to furnish railroads with sleeping cars and sleeping car service, but through these contracts it is able to control and does control the manufacture of sleeping cars throughout the United States. In the early days of the company a considerable number of cars was purchased from outside manufacturers. The next step was the establishment of a manufacturing plant, in 1881, by the Pullman Company at Pullman, Illinois, where from that year on, with but a few minor exceptions, all new cars used by the Company in furnishing Pullman service, were made by the company itself. Subsequently, as the findings of fact show, the manufacturing business was separated and transferred to a separate corporation. No evidence has been shown that the Pullman Company or Pullman, Inc., has ever entered into any express exclusive dealing contract with the present Pullman-Standard or its predecessor company. But it is perfectly clear, indeed not disputed, that since the manufacturing department of Pullman was established new cars have not been bought by Pullman from any other manufacturer. While corporate identities of the Pullman Company, the operating company, and Pullman-Standard are kept separated, both are owned by Pullman, Inc. Pullman-Standard supplies all the sleeping cars that Pullman uses. Pullman supplies all the sleeping cars which the railroads use. Other companies could make sleeping cars as the stipulation shows. But they can hardly hope to get a chance to do so, with the expectation of having them used on railroads, where the control of Pullman service is in the hands of those who use only Pullman made cars. That this control is complete is shown in the experience of both the Burlington & Quincy

---

[12] Mr. Vanderbilt also is disclosed as a director of Beech Creek, Boston & Albany, Canada Southern, Chicago & Northwestern, Chicago, St. Paul, Minnesota & Omaha, Cleveland, Cincinnati, Chicago & St. Louis, Detroit, Toledo & Milwaukee, Hudson River Connecting, Indiana Harbor Belt, Michigan Central, New Jersey Junction, New York & Fort Lee, New York & Harlem, Pittsburgh & Lake Erie, Rutland, St. Clair & Western, St. Lawrence & Adirondack, Shenango Valley, Toledo & Ohio Central, Wallkill Valley, W. Shore, Pittsburgh, McKeesport & Youghiogheny railroads by Poor's Directory of Directors—1940 Edition.

[13] Represented also on Pullman's Boards of Directors were officials and directors, inter alia, of the Mellon National Bank, J. P. Morgan & Co., Inc., First National Bank of New York, U. S. Steel Corp., Carborundum Co., Aluminum Co. of America, Gulf Oil Corp., United Petroleum Secur. Corp., Ethyl Gasoline Corp., Consolidated Edison Co. of N. Y., Koppers-United Corp., Armour & Company, American Tel. & Tel., American Can Co., Great Amer. Indemnity Co., Westinghouse Airbrake Co., E. I. duPont de Nemours & Co., Eastern Airlines and General Motors.

and the Santa Fe who had gone out into the market and bought cars designed and built by the Budd Manufacturing Company and which the railroads wished to try out in an experiment for attracting business to the roads. After negotiations Pullman did accept certain of these cars, under a lease arrangement, for service and operation. But Pullman made it exceedingly clear that thereafter all lightweight cars which it would operate and service would have to be furnished by it.[14] With such an unbroken record of exclusive dealing with its own manufacturing department or ally we do not need evidence of an express contract to conclude that it is understood between the parties that Pullman operated sleeping cars are to come from the manufacturing division of the Pullman enterprise only. What parties do, over a course of time, is surely as demonstrative of their understanding and intent as what they say. It is settled, of course, that an agreement may be found in a course of dealings or other circumstances as well as through exchange of words. Frey & Son, Incorporated, v. Cudahy Packing Company, 1921, 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892; United States v. A Schrader's Son, Inc., 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471. As D. A. Crawford, defendant's president, himself, said: "The Court should look to what was done, not to what was talked about."

### Applicability of the Sherman Act.

The facts presented in evidence constitute, in our opinion, an infraction of the monopoly section of the statute, that is § 2. We have here defendants who are not only the sole purveyors of sleeping car service, but who got themselves into that position by buying out competitors with the express intent, as recorded in their own corporate minutes, of eliminating what they pleased to call "useless competition." Then having acquired sole possession of the field they have so arranged matters. that no one else can enter it. This is equally true of the business of manufacturing sleeping cars as it is of the business of servicing sleeping cars, graphically described by the defendants' counsel as "chamber maid service". The economic and physical obstacles present to prevent an individual railroad from escaping the Pullman monopoly by itself supplying service are as great as the geographical obstacles which the Court found determinative in United States v. Terminal Railroad Association of St. Louis, 1912, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810.

Monopoly being clearly established any number of judicial statements can be found to the effect that instances of its baleful practices need not be shown to prove that the statute is violated. Benevolent monopoly is no less a monopoly because it is benevolent. A fortiori evidence that defendants know their business and run it in an efficient manner or even that their customers are not displeased is beside the legal point.

In addition to the existence of monopolistic power, however, there has been shown a series of instances of its exercise as, for example, the exclusion of the Budd products from sleeping car business; the insistence on all or nothing clauses in contracts; the obdurate resistance to changes in type of cars pressed for by railroad customers; the guaranty clause to protect Pullman in matters of earnings. These we take it are monopolistic practices. They show defendants' control of the market; they are also evidence of violation of § 1 of the statute concerning restraint of trade. As the Court says in

[14] In a memorandum to Mr. Crawford, dated July 28, 1936, Mr. Taylor frankly stated Pullman's position. "Mr. Engel then asked me what our position would be as to additional new-type lightweight cars which the Santa Fe undoubtedly would require in the very near future; he said this would probably run to not less than 6 additional trains. I told him, in accordance with my understanding with you, that The Pullman Company would not be willing to lease from the Railway Company any additional new-type lightweight cars built by outside car builders; he then called attention to the fact that their operating agreement expires Dec. 31-1937, in less than eighteen months, and asked what our position would be if they should insist upon an additional fleet of stainless steel lightweight cars. I told him that if they insisted upon having additional stainless steel cars and we were not willing to furnish such cars, and as they probably would not be delivered, if ordered outside, until some considerable time after the first of next year, we probably would not endeavor to stand on our rights under the contract and block them from operating the cars themselves but would agree to a cancellation of the contract."

United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 1940, footnote, page 226, 60 S.Ct. 811, 846, 84 L.Ed. 1129: " * * * the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." [15]

The government has contended throughout this case that it is unique on its facts in presenting a situation where the monopoly is 100% complete. With this contention, at the end of our consideration of the evidence presented, we are constrained to agree. We find a complete monopolization in the business of furnishing sleeping cars to railroads. This applies to the servicing of the cars and the furnishing of such cars both of which are completely controlled by the defendants. Through the furnishing of the cars under the exclusive service contracts the furnisher has complete control of the sleeping car manufacturing industry as well. The immaterial leaks in this watertight arrangement have been with its knowledge and consent, albeit the consent was given grudgingly. We have found no other case among the many to which we have been referred presenting such effective and complete monopolization of a given field by the sole proprietor in that field. This being so, we do not feel that there is point in the expenditure of paper and ink in discussing the applicability of cases where the court struggled with the question of the legal effect of partial control of a given market. The very point of such cases is to determine whether what has been done has gone far enough. Here what has been done has gone as far as it is possible to go, that is complete domination of the market.

The able argument for the defendant has, naturally enough, emphasized the legal propriety of various individual aspects of Pullman business in relation to its railroad customers. Thus it points out that every railroad company has an exclusive right to the transportation of passengers over its line and that it has a legal right, also, to employ Pullman or someone else to furnish part of its service on terms mutually agreed upon. We, ourselves, will go one step further and readily agree that the Supreme Court has upheld the legality of one such exclusive contract with one railroad.[16] Again, along this same line, it is emphasized that Pullman has a lawful right to enter into a contract for the performance of services with its own employees and its own tools. This, too, as a disassociated proposition probably would not be controverted by anybody. But it is clear that in a case like this it is the court's duty to look at the whole picture, not individual figures in it.[17] We have endea-

---

[15] The whole paragraph had best be quoted. It reads: "The existence or exertion of power to accomplish the desired objective (United States v. United States Steel Corp., 251 U.S. 417, 444, 445, 40 S.Ct. 293, 296-299, 64 L.Ed. 343, 8 A.L. R. 1121; United States v. International Harvester Co., 274 U.S. 693, 708, 709, 47 S.Ct. 748, 753, 754, 71 L.Ed. 1302) becomes important only in cases where the offense charged is the actual monopolizing of any part of trade or commerce in violation of § 2 of the Act, 15 U.S.C.A. § 2. An intent and a power to produce the result which the law condemns are then necessary. As stated in Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, ' * * * when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result.' But the crime under § 1 is legally distinct from that under § 2 (United States v. MacAndrews & Forbes Co., C.C., 149 F. 836; United States v. Buchalter, 2 Cir., 88 F.2d 625) though the two sections overlap in the sense that a monopoly under § 2 is a spe-

cies of restraint of trade under § 1. Standard Oil Co. v. United States, 221 U. S. 1, 59-61, 31 S.Ct. 502, 515, 516, 55 L. Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734; Patterson v. United States, supra, 222 F. p. 620. Only a confusion between the nature of the offenses under those two sections (see United States v. Nelson, D.C., 52 F. 646; United States v. Patterson, C.C., 55 F. 605; Chesapeake & O. Fuel Co. v. United States, 6 Cir., 115 F. 610) would lead to the conclusion that power to fix prices was necessary for proof of a price-fixing conspiracy under § 1. Cf. State v. Eastern Coal Co., 29 R.I. 254, 70 A. 1, 132 Am.St. Rep. 817, 17 Ann.Cas. 96; State v. Scollard, 126 Wash. 335, 218 P. 224, 32 A.L. R. 1082."

[16] Chicago, St. Louis & New Orleans Railroad Company v. Pullman Southern Car Company, 1891, 139 U.S. 79, 11 S.Ct. 490, 35 L.Ed. 97.

[17] "It is not essential that these contracts, considered singly be unlawful as in restraint of trade. So considered, they may be wholly innocent. Even acts absolutely lawful may be steps in a criminal plot. Aikens v. Wisconsin, 195 U.S. 194, 206, 25 S.Ct. 3, 49 L.Ed. 154, 160. But

-vored in the earlier portions of this opinion to assemble that whole picture composed as it is of many parts, some of which singly might be without legal significance. The sum total, it is clear, constitutes a complete domination by the defendants of a limited but important market. They have full control, they have the power to exclude, they have exercised the power and they have by all this violated the provisions of the Sherman Act.

### Relief.

The Court's conclusion being that there has been a violation of the Sherman Act the final question is the equitable relief to be had in this suit. Counsel for the plaintiff have repeatedly suggested that in case of a finding of violation, the questions concerning relief might be referred to a master or one of the regulatory commissions to hold hearings at which experts, governmental or private, could state their views regarding proper organization of the business of passenger transportation in the United States. The Court is not inclined to view favorably so ambitious a program. It does not regard itself as a legislative committee nor a regulatory commission. A law suit has been brought, factual and legal conclusions reached and the relief to be afforded should be that which the Court can both understand and apply.

On the other hand, we do not mean to be peremptory regarding the appropriate decree. Counsel for both sides are entitled to be heard with regard to its form; it may be that additional testimony with regard to some of the points will be helpful.

If so, we do not want to say in advance that we do not wish to hear it.

The object to be sought, for the convenience of the parties as well as the Court, is a decree which will embody the necessary elements of suitable equitable relief and require a minimum of supervision by the Court and reports and data by the parties. In other words, the Court should give a decree in which the duty of the defendants is outlined as explicitly as possible so that both the defendants and others dealing with them may know what their responsibilities are.

 Several things obvious for consideration in this connection the Pullman Company, through its officers, if not by corporate action, has already expressed its willingness to do. Indeed some of them, it is said, have already been put into practice by Pullman. We agree with the government's contention that this does not make an order requiring such practices less appropriate. If the things done are indicated to remove certain company activities from the prohibition of the Sherman Act, a decree requiring them is not less appropriate because the company's new policy, as distinguished from the old, may already include them. The decree will insure the continuance of such reformed practices.

We see no necessity for orders directed against individual defendants by name. Where corporate practices are forbidden or ordered the usual inclusion of the corporate defendants, and their directors and officers is sufficient.

---

a series of such contracts, if the result of a concerted plan or plot between the defendants to thereby secure control of the sale of the independent coal in the markets of other States, and thereby suppress competition in prices between their own output and that of the independent operators, would come plainly within the terms of the statute, and, as parts of the scheme or plot, would be unlawful. Thus in Swift & Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518, 524, where a plan or scheme consisting in many parts or elements was averred to constitute a combination forbidden by the act of July 2, 1890, it was said:

" 'The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a

body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful.' " United States v. Reading Company, 1912, 226 U.S. 324, 357, 358, 33 S.Ct. 90, 98, 57 L.Ed. 243.

See, also, United States v. Corn Products Refining Co., D.C.S.D.N.Y., 1916, 234 F. 964, 979, appeal dismissed, 1919, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805; United States Shoe Machinery Co. v. LaChapelle, 1912, 212 Mass. 467, 99 N.E. 289, 293, Ann.Cas.1913D, 715.

Among the matters in the mind of the Court which it deems relevant for inclusion in a proposed decree are the following:

1. The separation of the business of the Pullman Company from that of Pullman-Standard Car Manufacturing Company and the simplest method of accomplishing that separatio...

2. The establishing of the right of a railroad to purchase used sleeping cars from the Pullman Company.

3. The terms to be included in a direction that Pullman shall be required to operate and service sleeping cars designed and built by any manufacturer and tendered to it for operation and service.

4. The right of any railroad which wishes to operate all or a portion of its own sleeping car business so to do, regardless of existing sleeping car contracts with the Pullman Company.

5. The establishment of the obligation of the Pullman Company to furnish through-line sleeping car service to any railroad or group of railroads.

6. The elimination of exclusive dealing contracts between the Pullman Company and the railroads and the abrogation of such provisions in existing contracts.

The formulation of a decree will await further discussion and hearing upon these points and others which may be suggested by the parties.